943 A.2d 851

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. IBN ADAMS, A/K/A ALI IBN ADAMS (FACT), ALI–IBN ADAMS (AP-MIS) AND IBN A. ADAMS, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES COMER, A/K/A JAMES B. COMER AND JAMES F. COMER, DEFENDANT–APPELLANT.

Argued October 23, 2007—Decided March 26, 2008.

*Alison S. Perrone,* Designated Counsel, argued the cause for appellant Ibn Adams (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Perrone and Alan I. Smith,* Designated Counsel, on the briefs).

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant James Comer (*Yvonne Smith Segars,* Public Defender, attorney).

*LeeAnn Cunningham,* Assistant Prosecutor, argued the cause for respondent (*Paula T. Dow,* Essex County Prosecutor, attorney; *Ms. Cunningham and Hilary L. Brunell,* Executive Assistant Prosecutor, on the briefs).

*Jeanne Screen,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

In these back-to-back appeals, consolidated for the purpose of this opinion, defendants Ibn Adams and James Comer were charged with various offenses arising out of multiple robberies and a homicide. A third defendant, Dexter Harrison, was charged with similar offenses but in a separate indictment. During the criminal investigation, the police engaged in less than optimal out-of-court photograph identification techniques. Following a hearing to test the admissibility of those identifications of defendants, the trial court found the procedures used were unduly suggestive, but nevertheless reliable and therefore admissible. Adams and Comer were tried together before a jury. Harrison, who reached a plea agreement with the State, was a crucial witness for the State in its case against Adams and Comer. Defendants did not request, and the trial court did not give, a specific jury charge that Harrison's guilty plea could only be considered to assess his credibility and that the jury should carefully scrutinize his testimony in light of his special interest in the case. Adams and Comer were convicted of felony-murder, multiple robberies, and weapons offenses. Although both defendants received lengthy consecutive sentences, no sentence for any charge was beyond the then-presumptive sentence for each offense. The Appellate Division affirmed the convictions and sentences. Defendants petitioned this Court for certification, and we granted the separate

petitions. *State v. Adams,* 189 *N.J.* 650, 917 *A.*2d 789 (2007); *State v. Comer,* 191 *N.J.* 315, 923 *A.*2d 230 (2007).

We now affirm. We conclude that, similar to the view we expressed in *State v. Herrera,* 187 *N.J.* 493, 902 *A.*2d 177 (2006), these cases do not present a proper record to consider modifying our standards for evaluating the admissibility of out-of-court identifications. Further, on the record presented, we agree with the Appellate Division that there was sufficient credible evidence to affirm the trial court's decision to admit the identification testimony and that it was not plain error for the trial court to fail to give a cautionary charge on the use of Harrison's testimony and guilty plea. Lastly, we hold that defendants' presumptive sentences, imposed prior to our decision in *State v. Natale,* 184 *N.J.* 458, 878 *A.*2d 724 (2005), do not require remands.

I.

A.

Briefly, on April 17, 2000, Adams, Comer, and Harrison stole a car and committed several armed robberies, one of which resulted in the shooting death of George Paul. After the stolen car, a white Honda Civic, ran out of gas, they pushed it to Tullo's Truck Stop where they eventually were apprehended. A search of the three suspects and the stolen vehicle revealed incriminating evidence of the robberies. The police drove the three suspects to headquarters where Harrison agreed to give a statement. He admitted they had committed two robberies in East Orange and that he had left his car parked on the street. The police obtained a search warrant and searched Harrison's Nissan, from which they recovered a snatch bar, a bookbag, a pair of boots, and a jacket. Based on Harrison's statement, Detective John Plaugir drove Harrison back to Tullo's Truck Stop and retrieved a loaded .25 caliber handgun from the bathroom. During the ensuing investigation, various victims met with the police and identified photographs of

the perpetrators and various items of personal property that had been taken from them.

Defendants Adams and Comer were indicted for (1) second-degree conspiracy to commit armed robbery, *N.J.S.A.* 2C:5-2 (count one); (2) first-degree felony murder, *N.J.S.A.* 2C:11-3(a)(3) (count three); (3) four counts of first-degree robbery, *N.J.S.A.* 2C:15-1 (counts four, seven, ten, and thirteen); (4) six counts of third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39-5(b) (counts five, eight, eleven, fourteen, seventeen, and eighteen); (5) four counts of possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39-4(a) (counts six, nine, twelve, and fifteen); and (6) third-degree theft, *N.J.S.A.* 2C:20-3(a) (count sixteen). In addition, Adams was charged with first-degree murder, *N.J.S.A.* 2C:11-3(a)(1) and (2) (count two).

Co-defendant Harrison was indicted separately. He entered into a plea agreement with the State in which he pled guilty to various charges in exchange for a recommended concurrent sentence of twenty years with an eighty-five-percent parole bar. The sentence could be lowered depending on the quality and quantity of Harrison's testimony against the other defendants.

### B.

Prior to trial, Adams and Comer moved to suppress the out-of-court identifications by Dinis Sachdeva, Deru Abernathy, Allyson Attabola, and Tassandra Wright. At the suppression hearing, Detective David Montgomery of the Kearny Police Department and Detective Tom Wright of the East Orange Police Department testified on behalf of the State.

Detective Montgomery testified that around 5:20 a.m. on April 18, 2000, Dinis Sachdeva, the gas station attendant, arrived at the police station and gave a statement. When Detective Montgomery showed Sachdeva single Polaroid photographs of the three defendants, Sachdeva immediately identified the photographs of Comer and Harrison, but could not identify Adams. Detective Montgomery testified that he showed Sachdeva individual photo-

graphs of the three men because "[Sachdeva] had just identified them at the scene and we wanted to take a statement from him as to his observations."

Later that same morning, Detective Montgomery interviewed Tassandra Wright.[1] She indicated that her paycheck was stolen from her at gun point. Detective Montgomery showed Tassandra the same single photographs of the suspects he had shown to Sachdeva. Tassandra identified Adams as the man who entered the passenger side of her car and stole her paycheck, Comer as the man who approached the driver's side window and pointed a handgun at her, and Harrison as the driver of the Honda Civic.

Detective Wright testified that on April 20, 2000, two days after the robbery, he interviewed Deru Abernathy at the East Orange Police Department. Detective Wright said that he displayed fifteen to twenty pictures to Abernathy, one at a time, and told him that "the people in the pictures may be responsible for the robbery that took place against him." Abernathy identified Adams and Comer as the passengers in the car and Harrison as the driver.

Detective Wright explained that he knew he did not have an appropriate array, but he was unable to locate suitable photos despite contacting four other police departments. He claimed that he was under time constraints to obtain identification from the East Orange victims so that charges could be filed. Detective Wright admitted that he would not have used the assortment of non-suspect photos he showed to Abernathy in a proper array because the men depicted were not similar enough to the suspects. Except for the three photos of defendants that Abernathy selected, Detective Wright testified that he discarded the other photos.

Detective Wright also met with Allyson Attabola on April 20, 2000. He showed her three single photos of the three suspects. Attabola identified Adams as the rear passenger, Comer as the

---

[1] Because Tassandra Wright and Detective Tom Wright share the same last name, we use Tassandra Wright's first name to identify her.

front seat passenger, and Harrison as the third person present at the crime scene. Detective Wright acknowledged that the procedure he used deviated from the standard procedures for identifications and that if he had it to do over, he would do it differently.

The trial court denied defendants' motions to suppress the identifications. The court found that the procedures were definitely suggestive but "the identification process was not so suggestive as to taint the out-of-court identification to such a degree that the defendants were denied their due process of law." In support of that conclusion, the court found that: all of the witnesses had a good opportunity to view defendants; they were certain about their identifications; there were no inconsistencies with their prior descriptions of defendants; their attention was focused on defendants during the crimes; and the durations of time between the incidents and the identifications were all relatively short.

## C.

At trial, the State presented evidence to show that around 11:30 p.m. on April 17, 2000, Abernathy was in his car talking to a friend on a cell phone when he noticed a blue Nissan pass by, stop, and then reverse until the vehicles were beside each other. Abernathy peered into the car and noticed the occupants pointing guns at him. Two of the men, whom Abernathy later identified as Adams and Comer, got out of the Nissan, approached Abernathy, forced him from his car, and yelled "stickup." The assailants took Abernathy's Samsung cellular phone, gold chains, Movado watch, leather jacket, and boots. Abernathy believed that one of the men held a nine-millimeter weapon and the other a .380 caliber handgun.

After the men left, Abernathy went home and called the police. He also reported the theft of his cellular phone to the phone company and instructed them to deactivate it. A short while later, he called his cellular phone number to see if the company had complied with his request and was shocked to hear one of the assailants answer. Abernathy expressed his anger and hung up,

but then received a call back from a man who told him that "we could have got you, you know what I'm saying." At trial, Abernathy identified Comer as the front seat passenger with a handgun, and Adams as the back seat passenger who approached him with a gun. He also testified that he had previously made an out-of-court identification of Adams and Comer.

That same night George Paul was shot to death on Park Avenue in East Orange. Except for Harrison's testimony, which is summarized below, the State presented no eyewitnesses to the shooting. The police recovered Paul's wallet and a spent nine-millimeter shell casing at the scene.

Attabola testified that around 2:00 a.m. on April 18, 2000, she parked her car in a parking lot on Prospect Street across from her East Orange home. As she crossed the street, carrying a bookbag and some groceries, a white car stopped alongside of her and two people jumped out. One of the men, whom she identified as Adams, pointed a black handgun at her and repeatedly asked her "where it was at." She testified that Adams searched her pockets and took her bookbag containing her wallet, picture identification, sweatpants, t-shirt, and her husband's bank card. Attabola also testified that she made out-of-court identifications of both Adams and Comer.

The final victim that night was Tassandra, a postal worker at Newark Airport. At trial, she testified to the following. Around 3:00 a.m., she was driving home on Route 1 & 9 in Kearny when a white Honda Civic cut her off. The same car stopped beside her at three consecutive red lights, permitting her to see the three men inside. Later, while Tassandra was parking her car on the street near her Jersey City home, the white Honda crashed into the front of her car. Harrison was driving. Tassandra turned to see Comer tap on her window with a handgun and demand money. Adams then entered her front passenger door and removed her paycheck and employee identification. As soon as the men departed, Tassandra called the Jersey City police to report the incident. During her interview with a detective later that morn-

ing, she identified all three men and specified the role that each played during the crime.

Sachdeva, the attendant at Tullo's Truck Stop in Kearny, testified that he was working around 4:00 a.m. when he observed three young men pushing a white Honda Civic into the station. He told them they would have to wait until 5:00 a.m. to receive gas because the pumps were not activated until then. Sachdeva became suspicious when one of the men asked for diesel fuel for the gas-fueled car. A truck driver who overheard the conversation also became suspicious and called the police.

Kearny Sergeant John Dougan and police officer Dennis Gascier responded to the truck stop. Sachdeva directed them to the Honda. Sergeant Dougan noticed that the ignition was missing. He approached the three men, who denied having any knowledge of the vehicle. At some point, Harrison dropped the bookbag he was carrying and Adams and Comer walked into the bathroom.

The police called for backup. Detective David Montgomery and two officers responded to the scene. One of the officers opened the bookbag and found a loaded .380 handgun, a cellular phone, a tape recorder, sunglasses, a headset, and some women's clothing. The police placed the three men under arrest and searched them. The police recovered several cellular phones, a gold watch, two gold chains, a jewelry charm, a paycheck made out to Tassandra Wright, and an identification card in the same name.

The police transported defendants to headquarters. Detective John Plaugir and Officer Haverty interviewed Harrison, who agreed to give a statement. Harrison said that the three defendants had committed two robberies in East Orange and that they had hidden a loaded .25 caliber handgun in the bathroom of the truck stop. The police returned to the truck stop and located the handgun that was hidden in the bathroom.

Harrison testified on behalf of the State. He acknowledged that he pled guilty to aggravated manslaughter, second-degree conspiracy, four counts of first-degree robbery, receipt of stolen

property, and fourth-degree criminal mischief in exchange for a recommended twenty-year sentence with an eighty-five-percent parole disqualifier. He stated that, as part of his plea agreement, he agreed to testify against Adams and Comer.

Harrison testified that the three of them met and decided to rob some people. He had a .380 handgun, while Adams had a nine-millimeter handgun and Comer had a .25 caliber handgun. Harrison said they robbed Abernathy in East Orange. They then drove to Park Avenue, where Adams and Comer got out of the car and robbed George Paul. Harrison claimed that Adams was searching Paul's pockets when he heard a gun shot. When Adams and Comer returned to the car, Harrison asked Adams why he shot Paul. Adams replied that it was because Paul had no money.

Harrison testified that, at that time, he told Adams and Comer that he did not want to use his Nissan car any more, so they decided to steal a vehicle. They drove to Newark where Adams used a snatch bar to steal a white Honda Civic. Harrison then parked his Nissan on Central Avenue, leaving several stolen items in the car.

They then proceeded to rob Attabola in East Orange and Tassandra in Jersey City. Harrison said that when they were driving over a bridge on Route 1 & 9, Adams tossed his nine-millimeter handgun out the window. He testified that they were arrested at a gas station in Kearny after the Honda ran out of gas and the police arrived.

Adams and Comer did not testify. The sole witness defendants called was Detective Wright, who confirmed that he showed Abernathy fifteen to twenty photographs and asked him to identify the perpetrators. Detective Wright admitted that he destroyed the photos that Abernathy did not select. He acknowledged that during the photo identification by Attabola, he showed her only three or four photos. Detective Wright admitted that the identification procedures he used were not standard protocol, but he was unable to locate other photos of similar quality, likeness, and color.

The jury found Adams guilty of conspiracy, felony murder, two counts of first-degree robbery, two counts of second-degree robbery, theft, and seven weapons offenses. Adams was found not guilty of murder and three additional weapons offenses. The trial court sentenced Adams to a thirty-year term of imprisonment without parole for the felony-murder conviction. Additionally, Adams received two consecutive fifteen-year sentences for the first-degree robberies of Abernathy and Attabola, a seven-year consecutive sentence for the second-degree robbery of Wright, all subject to eighty-five percent parole disqualifiers, and concurrent four-year terms for the weapons offenses. Adams' aggregate sentence was sixty-seven years in prison with 61.45 years without parole.

The jury found Comer guilty of conspiracy, felony murder, three counts of first-degree robbery, one count of second-degree robbery, theft, and nine weapons offenses. Comer was acquitted of one additional weapons offense. The trial court imposed a thirty-year term of imprisonment without parole for the felony murder, three consecutive fifteen-year terms with an eighty-five percent parole disqualifier for the robberies of Abernathy, Attabola, and Wright, and concurrent four-year terms on the weapons offenses. Comer's aggregate sentence was seventy-five years with 68.25 years without parole.

Adams and Comer filed separate appeals raising numerous arguments. The Appellate Division consolidated the appeals for purposes of the opinion and affirmed in one unpublished per curiam opinion. *State v. Adams*, A–4915–03T4, 2006 *WL* 3798760 (Dec. 28, 2006) (slip op. at 1). The panel found sufficient credible evidence to support the trial court's conclusion that the out-of-court identifications were reliable and, alternatively, even if the trial court erred, the evidence of guilt was so overwhelming that any error was harmless. *Id.* at 4–5. The panel also noted that a trial court, if requested, should normally charge the jury to consider a testifying co-defendant's guilty plea when evaluating the credibility of that witness; but the charge need be given only

if requested and it was not requested here. *Id.* at 7–8. Finally, the panel rejected defendant's contentions that the trial court's sentencing to the then-existing presumptive terms violated *Natale* principles. *Id.* at 14–15.

Both defendants petitioned this Court for certification. We granted each petition separately, limited to the same three issues: (1) whether the out-of-court and in-court identifications should have been excluded; (2) whether the trial court committed plain error in failing to instruct the jury on how to consider Harrison's testimony and guilty plea; and (3) whether the sentence imposed violated the principles of *Natale, supra,* 184 *N.J.* at 458, 878 *A.*2d 724. *Adams, supra,* 189 *N.J.* at 650, 917 *A.*2d 789; *Comer, supra,* 191 *N.J.* at 315, 923 *A.*2d 230. We also granted amicus curiae status to the New Jersey State Attorney General's Office.

## II.

Before the Appellate Division, defendants asserted error in the trial court's finding that, notwithstanding the suggestiveness of the identification procedures, the out-of-court identifications were reliable. For the first time, in supplemental briefs before us, defendants urge that we abandon the present standard of admissibility for one-on-one identifications, which allows this type of suggestive identification to be admitted at trial based on a judicial determination of reliability. Instead, defendants argue that we adopt a new standard that would exclude unnecessarily suggestive identifications without regard to a judicial determination of reliability. Alternatively, defendants urge that, even under the current standard, the identification procedures used by the police were impermissibly suggestive and resulted in a very substantial likelihood of irreparable misidentification. Defendants also contend that the absence of a limiting instruction concerning the proper use of Harrison's guilty plea deprived them of a fair trial. Finally, defendants contend that they should be resentenced in light of our decision in *Natale.*

In contrast, the State urges that we not consider defendants' argument, raised for the first time in defendants' supplemental briefs, to abandon the long-standing adherence to our standards in determining the admissibility of out-of-court identifications. Applying our current standards here, the State argues that, although the out-of-court identifications of defendants were suggestive, the procedures were not so suggestive as to create a substantial likelihood of irreparable misidentification. Further, the State contends that the trial court did not commit plain error in failing to sua sponte provide a limiting charge on the uses of Harrison's guilty plea, and that the sentences imposed do not violate the principles of *Natale*. Additionally, the Attorney General urges that defendants' sentences are consistent with *Natale* because the sentences do not exceed the then-presumptive terms.

## III.

### A.

We turn first to defendants' request that we adopt new standards to determine the admissibility of out-of-court identification evidence. Recently, we faced a similar argument in *Herrera, supra,* 187 *N.J.* at 499, 902 *A.*2d 177. We recognized the fallibility of identification evidence but declined to adopt a new standard without an adequate record. *Id.* at 501, 902 *A.*2d 177. We said that

> [w]e have no reason to doubt that if defendant had raised these arguments before the trial court and submitted the current research in support of his request for a new standard for determining the admissibility of showup identification, a different record would have been made. The trial court would have received the evidence and made its decision, and the Appellate Division then would have had a full record to review. In that event, the arguments defendant now makes would be properly before us. In the absence of such a record, and in light of our consistent application of federal constitutional precedent in deciding the admissibility of identification evidence, we decline to adopt a new standard under our state constitution.
>
> [*Ibid.*]

Before the Appellate Division, defendants urged that the identification procedures were impermissibly suggestive, resulted in a

substantial likelihood of misidentification, and were not reliable. Defendants failed to make a record, and did not argue, that the standard for admissibility of showup evidence should be altered. Even in the separate petitions for certification submitted after our decision in *Herrera*, each defendant relied on the arguments made in the Appellate Division and did not suggest that we alter our present standard. It was not until they filed their supplemental briefs that the argument was presented.

In light of the record in this matter, we find no reason to part from our decision in *Herrera*, which we decided after the trial in the present case, that in the absence of an appropriate record in the trial court, we "decline to adopt a new standard." *Id.* at 501, 902 *A*.2d 177. We continue to encourage the parties to present a proper record in an effort to improve our standards for gauging the admissibility of out-of-court identification procedures. Until then, as we made clear in *Herrera*,

[o]ur Court has consistently followed the United States Supreme Court's analysis in determining the admissibility of out-of-court and in-court identifications. *State v. Madison*, 109 *N.J.* 223, 233, 536 *A*.2d 254 (1988). Until we are convinced that a different approach is required after a proper record has been made in the trial court, we continue to follow the Supreme Court's approach.

[*Id.* at 504, 902 *A*.2d 177.]

We note also that subsequent to the identification procedures conducted in this case, in 2001 the New Jersey Attorney General's Office issued guidelines that were intended "to insure [sic] that identification procedures in this state minimize the chance of misidentification of a suspect." *Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* (Apr. 18, 2001)[2] (the Guidelines). In explaining the need for improved identification procedures, the Attorney General noted that in "one 1998 study of DNA exoneration cases, ninety percent of the cases analyzed involved one or more mistaken

---

[2] The Guidelines are attached to our opinion in *Herrera, supra,* 187 *N.J.* at 511–20, 902 *A*.2d 177.

eyewitness identifications." *See Herrera, supra,* 187 *N.J.* at 511, 902 *A.*2d 177.

The Guidelines provide that prior to the identification procedure, "[t]he witness should be instructed ... that the perpetrator may not be among those in the photo array ... and, therefore, they should not feel compelled to make an identification." *Id.* at 516, 902 *A.*2d 177. The Guidelines also provide that the witness should be shown only one photo or one person at a time and that the lineup of photos should be "comprised in such a manner that the suspect does not unduly stand out." *Ibid.*

In describing the photo lineup procedure, the Guidelines instruct the investigator to:

1. Include only one suspect in each identification procedure.
2. Select fillers (nonsuspects) who generally fit the witness' description of the perpetrator. When there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.
3. Select a photo that resembles the suspect's description or appearance at the time of the incident if multiple photos of the suspect are reasonably available to the investigator.
4. Include a *minimum* of five fillers (nonsuspects) per identification procedure.
5. Consider placing the suspect in different positions in each lineup when conducting more than one lineup for a case due to multiple witnesses.
6. Avoid reusing fillers in lineups shown to the same witness when showing a new suspect.
7. Ensure that no writings or information concerning previous arrest(s) will be visible to the witness.
8. View the array, once completed, to ensure that the suspect does not unduly stand out.
9. Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

[*Ibid.*]

In addition, we recently exercised our supervisory powers over the administration of our criminal courts to impose several limitations on the use of out-of-court identifications. We now require law enforcement officers, as a condition to the admission of out-of-court identifications, to make and maintain a written record detail-

ing the identification procedure. *State v. Delgado,* 188 *N.J.* 48, 63, 902 *A.*2d 888 (2006). And, last year we directed that our model jury charge for eyewitness identification should underscore for jurors that "eyewitness identification testimony requires close scrutiny and should not be accepted uncritically." *State v. Romero,* 191 *N.J.* 59, 75, 922 *A.*2d 693 (2007).

## B.

We turn now to consider whether the identification procedures in this case were so impermissibly suggestive that they could not be saved by any indicia of reliability. In making that determination, we are mindful that the trial court's findings at the hearing on the admissibility of identification evidence are "entitled to very considerable weight." *State v. Farrow,* 61 *N.J.* 434, 451, 294 *A.*2d 873 (1972). That is, the trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings. *See State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999).

In our two-pronged approach to determine the admissibility of an out-of-court identification, the reviewing court must first " 'ascertain whether the identification procedure was impermissibly suggestive.' " *Romero, supra,* 191 *N.J.* at 76, 922 *A.*2d 693 (quoting *Herrera, supra,* 187 *N.J.* at 503, 902 *A.*2d 177). "What is being tested in the preliminary inquiry as to admissibility is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer." *Farrow, supra,* 61 *N.J.* at 451, 294 *A.*2d 873. If the procedure is found to be impermissibly suggestive, the court must then decide "whether the impermissibly suggestive procedure was nevertheless reliable by considering the totality of the circumstances and weighing the suggestive nature of the identification against the reliability of the identification." *Romero, supra,* 191 *N.J.* at 76, 922 *A.*2d 693 (citations and internal quotations omitted). We have

declared that " '[r]eliability is the linchpin in determining the admissibility of identification testimony.' " *State v. Madison*, 109 *N.J.* 223, 232, 536 *A.*2d 254 (1988) (quoting *Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977)). The *Manson* Court set forth the factors that should be considered in determining reliability.

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
>
> [*Ibid.*]

If after the evaluation of those factors the court is convinced that, notwithstanding the suggestive nature of the procedure, the witness's identification is reliable, then the identification may be admitted into evidence. *Herrera, supra*, 187 *N.J.* at 503–04, 902 *A.*2d 177.

Applying those standards here, it is not disputed that the identification procedures followed by the police with each of the witnesses were impermissibly suggestive. The essential question is whether there was sufficient reliability in the identifications to overcome the suggestive nature and establish that there was not a substantial likelihood of irreparable misidentification.

In considering the reliability of the identifications, the trial court found the following:

> Each one of these witnesses were quite certain about the identification, notwithstanding the suggestibility.
>
> They had every—based upon what they said to the officers, had every opportunity to view the defendants at the time of the crime.
>
> They certainly had their attention focused on the defendants who were committing the crimes.
>
> There was no inconsistencies with regard to their descriptions of the defendants.
>
> . . . .
>
> And the time between the crime and confrontation was . . . relatively short.
>
> There is, therefore, little doubt that, notwithstanding the quality of the identification procedures used, the suggestibility of the identification procedures used, the, frankly, lack of competence with regard to the identification procedures exercised, and notwithstanding that they were not so suggestive as to create a substantial

likelihood of irreparable misidentification. That being the case, the out-of-court identifications are admissible in their entirety.

Our examination of the record convinces us that there was sufficient credible evidence for the trial court to reach those conclusions. As found by the trial court, the evidence showed that all the witnesses had an opportunity to view the defendants they identified. Defendants were not wearing masks and the witnesses were able to observe defendants from a short distance. Aside from Tassandra, the lone witness to describe the lighting as poor, all of the other witnesses described the lighting as adequate to good: Sachdeva testified that there were many lights on at the gas station; Abernathy said that his visibility was "pretty good" because there was a streetlight overhead; and Attabola described her visibility as "fine" due to the streetlights "coming from the parking lot" and the light behind her building. The witnesses also testified to the attention they paid to their respective encounters with defendants. Tassandra testified that she got a good look at Comer's eyes, and Attabola testified that she got a good look at two of the defendants, but did not get a good look at Harrison, which explained her inability to identify him. In addition, Abernathy, although acknowledging that his primary focus was on the gun pointed in his face, testified that he was able to view everything else and got a good look at defendants.

Although the trial court found that there were no inconsistencies with the accuracy of the witnesses' prior descriptions, both defense counsel established on cross-examination inaccuracies in the witnesses' initial descriptions. For example, Abernathy's initial statement listed defendants at about the same height and weight, but that is not correct because Comer is clearly taller than Adams. On the other hand, all of the witnesses properly noted that Adams was of a darker complexion than Comer and several witnesses correctly noted the height differences. Furthermore, all of the victims consistently stated that Adams was the back seat passenger while Comer was the front seat passenger.

Additionally, the times between the initial encounters and the later photo identifications were relatively short. All of the identi-

fications were made within two days of the incident. Sachdeva's identification actually was made a little over an hour after the incident, and Tassandra's identification was made within a few hours. *See, e.g., Manson v. Brathwaite,* 432 *U.S.* at 116, 97 *S.Ct.* at 2253–54, 53 *L.Ed.*2d at 155 (1977) ("The photographic identification took place only two days later. We do not have here the passage of weeks or months between the crime and the viewing of the photograph."); *Madison, supra,* 109 *N.J.* at 242, 536 *A.*2d 254 ("A two month time lapse without more ... does not cause us to conclude that the evidence of identification is inadmissible."); *Herrera, supra,* 187 *N.J.* at 509, 902 *A.*2d 177 (noting that "an approximate five-hour period between the incident and the identification does not subvert the reliability of the identification procedure").

We hold that based on the totality of the circumstances, there was sufficient evidence in the record for the trial court to conclude that, despite the clear suggestive nature of the identification procedures, the identifications were reliable and did not result in a substantial likelihood of misidentification. Consequently, we find no reversible error in the admission of the out-of-court identifications.

## IV.

Defendants assert error in the trial court's failure to give a limiting instruction concerning the guilty plea of co-defendant Harrison. Specifically, defendants contend that the trial court failed to instruct the jury that Harrison's guilty plea could only be considered to assess his credibility and that the jury should view his testimony with suspicion in light of his plea agreement. Further, they urge that the court should have instructed the jury that Harrison's guilty plea could not be used as substantive evidence of their guilt.

Because defendants did not object to the instructions at trial, we consider these issues under the plain error rule. *R.* 2:10–2. Generally, a defendant waives the right to contest an instruction

on appeal if he does not object to the instructions as required by *Rule* 1:7–2. Nevertheless, an appellate court may reverse on the basis of unchallenged error if the court finds that the error was "clearly capable of producing an unjust result." *R.* 2:10–2.

We have explained that plain error in the context of a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (citations omitted). The charge to the jury must be read as a whole in determining whether there was any error. *Ibid.* We note also that, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel." *State v. Marshall,* 123 *N.J.* 1, 145, 586 *A.*2d 85, (1991) (citations and internal quotations omitted), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are "poor candidates for rehabilitation under the plain error theory." *Jordan, supra,* 147 *N.J.* at 422, 688 *A.*2d 97 (citations and internal quotations omitted).

We have long noted that "a defendant may be convicted solely on the uncorroborated testimony of an accomplice." *State v. Begyn,* 34 *N.J.* 35, 54, 167 *A.*2d 161 (1961). However, because of the inherent conflict in such testimony, "a defendant has a right, upon request, to a specific jury instruction 'that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his specific interest in the proceeding.'" *Ibid.* (quoting *State v. Spruill,* 16 *N.J.* 73, 80, 106 *A.*2d 278 (1954)). To be sure, "'the status of a witness as an accomplice or codefendant invites special consideration' with respect to that witness's credibility." *State v. Harris,* 156 *N.J.* 122, 179, 716 *A.*2d 458 (1998) (quoting

*State v. Gross,* 121 *N.J.* 1, 16, 577 *A.*2d 806 (1990)). The trial court should caution the jury "regarding the credibility of witnesses who may have a special interest in the outcome of the cause, which might lead to influencing their testimony, because of some involvement in the criminal situation out of which the indictment and trial of the defendant arose." *Begyn, supra,* 34 *N.J.* at 54, 167 *A.*2d 161 (citation omitted).

Although a co-defendant's guilty plea may be considered for credibility purposes, it may not be used as substantive evidence of the defendant's guilt. *State v. Stefanelli,* 78 *N.J.* 418, 430–33, 396 *A.*2d 1105 (1979). We recognize that there may be a myriad of "other undisclosed or collateral factors" that contribute to a co-defendant entering a guilty plea. *Id.* at 433, 396 *A.*2d 1105 (citation omitted). More importantly, a defendant is entitled "to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *Id.* at 430–31, 396 *A.*2d 1105 (citation omitted). In sum, the trial court should instruct the jury that it must carefully scrutinize the testimony of a co-defendant in light of the witness's special interest and that a co-defendant's guilty plea may be used only to assess credibility and may not be used as substantive evidence of a defendant's guilt.

In the present case, the trial court should have instructed the jury to carefully scrutinize co-defendant Harrison's testimony, and not to consider his guilty plea as substantive evidence of defendants' guilt but only in assessing Harrison's credibility. Defendants, however, neither requested those instructions nor did they object to the instructions that were given. The question then is whether in the context of the trial, the error was clearly capable of bringing about an unjust result.

We find no plain error in the court's failure to give a cautionary instruction on the allowable uses of Harrison's guilty plea and his testimony. *See Stefanelli, supra,* 78 *N.J.* at 436, 396 *A.*2d 1105. At trial, defense counsel thoroughly cross-examined Harrison to challenge his credibility and Harrison's lack of credibility was a

major theme in closing arguments for the defense, which asserted that Harrison was a liar. The detailed testimony of Harrison independently established his guilt of the crime and, therefore, his guilty plea added little weight to that testimony. Further, the trial court gave the standard charge on credibility. Under those circumstances, we are satisfied that "the error did not have the clear capacity to produce an unjust result and that it had a minimal effect on the outcome of trial." *Id.* at 437, 396 *A*.2d 1105.

## V.

Lastly, defendants argue that their presumptive sentences violated *Natale.* We disagree.

In *Natale, supra,* because we treated the then-presumptive term as the maximum sentence that the trial court could impose without a remand for resentencing, we held that "a sentence *above the presumptive statutory term* based solely on a judicial finding of aggravating factors, other than a prior criminal conviction, violates a defendant's Sixth Amendment jury trial guarantee." 184 *N.J.* at 466, 878 *A.*2d 724 (emphasis added); *see State v. Thomas,* 188 *N.J.* 137, 152, 902 *A.*2d 1185 (2006) ("With respect to pre-*Natale* ordinary-term sentences, defendants *whose sentences were above the presumptive. sentence have been vacated and remanded* for re-determination without use of a required presumptive sentence . . . ." (emphasis added)).

Here, defendants' Sixth Amendment rights were not violated because they were not sentenced above the then-existing presumptive sentence. *See State v. Abujudeh,* 186 *N.J.* 361, 361, 895 *A.*2d 449 (2006) (reversing remand order on seven-year presumptive sentence for second-degree crime). Consequently, we find no cause to remand for reconsideration of the sentences imposed.

## VI.

The judgments of the Appellate Division are affirmed.

JUSTICE ALBIN, concurring.

In *State v. Herrera*, 187 *N.J.* 493, 902 *A.*2d 177 (2006), this Court determined that it would continue to adhere to the federal standard for determining the admissibility of an out-of-court identification until "convinced that a different approach is required after a proper record has been made in the trial court." *Id.* at 504, 902 *A.*2d 177. The federal standard, and therefore our current state standard, requires "the [trial] court first to ascertain whether the identification procedure was impermissibly suggestive, and, if so, whether the impermissibly suggestive procedure was nevertheless reliable." *Id.* at 503–04, 902 *A.*2d 177. Applying that governing standard, I concur with the majority that despite the highly suggestive nature of the out-of-court identification procedures employed by the police, sufficient credible evidence in the record supported the trial court's finding that "the identifications were reliable" and therefore admissible in court. *Ante* at 206, 943 *A.*2d at 863.

However, I stand by my dissent in *Herrera, supra,* in which I stated that "[i]t is time for this Court to announce that the use of unnecessarily suggestive identification procedures violates the due process guarantees of Article I, Paragraph 1 of the New Jersey Constitution." 187 *N.J.* at 528, 902 *A.*2d 177 (Albin, J., dissenting). "The current standard permits highly suggestive identification procedures, however unnecessary, so long as a court later ratifies the identification as otherwise reliable." *State v. Romero,* 191 *N.J.* 59, 81, 922 *A.*2d 693 (2007) (Albin, J., dissenting). The photographic show-up procedure used by the police in this case has been described as " 'the most grossly suggestive identification procedure now or ever used by the police.' " *Herrera, supra,* 187 *N.J.* at 525, 902 *A.*2d 177 (Albin, J., dissenting) (quoting Patrick M. Wall, *Eye–Witness Identification in Criminal Cases* 28 (1965)). A photographic show-up—the displaying of a single suspect's photograph to a witness—is an effective technique for securing an identification, but also the most conducive technique for securing a misidentification. In turn, misidentification is the

single greatest cause of wrongful convictions in this country. *See Herrera, supra,* 187 *N.J.* at 520, 902 *A.*2d 177 (Albin, J., dissenting) (citing *State v. Dubose,* 285 *Wis.*2d 143, 699 *N.W.*2d 582, 592 (2005)).

This Court should not only send a signal, but adopt a standard that discourages law enforcement from *unnecessarily* using a technique that maximizes the potential for mistaken identifications and wrongful convictions. I am prepared today, based on the arguments made to our Court, to prohibit highly suggestive identification procedures, such as the showing of a single suspect photograph to a witness, except when necessary due to an exigency. The majority has insisted that a proper record be developed at the trial level before consideration is given to altering our present law. Because the majority has left the door open, the day will soon come, with the proper record, for our Court to articulate a standard in identification cases that minimizes, rather than exponentially increases, the likelihood of misidentifications and wrongful convictions.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.