**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3518-14T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DANIEL BEDFORD,

      Defendant-Appellant.

_____

      Submitted March 28, 2017 — Decided  May 26, 2017

      Before Judges Messano and Grall.

      On appeal from the Superior Court of New
      Jersey, Law Division, Essex County,
      Indictment No. 13-03-0681.

      Joseph E. Krakora, Public Defender, attorney
      for appellant (Stefan Van Jura, Deputy
      Public Defender II, of counsel and on the
      brief).

      Carolyn A. Murray, Acting Essex County
      Prosecutor, attorney for respondent (Kayla
      Elizabeth Rowe, Special Deputy Attorney
      General/Acting Assistant Prosecutor, of
      counsel and on the brief).

PER CURIAM

Defendant Daniel Bedford appeals from a judgment of conviction and sentence. A jury found defendant guilty of first-degree carjacking, N.J.S.A. 2C:15-2 (count one); first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), which the jurors considered as a lesser included offense of murder, N.J.S.A. 2C:11-3a(1) & (2) (count two); fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5d (count three); and, third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4d (count four).

At sentencing, the judge merged the convictions for aggravated manslaughter and possession of a knife with an unlawful purpose and sentenced defendant to concurrent terms of imprisonment for counts one through three. The concurrent terms are: fifteen years for carjacking; twenty-five years for aggravated manslaughter; and one year for unlawful possession of a weapon. The sentences for aggravated manslaughter and carjacking include terms of parole ineligibility and supervision required by the No Early Release Act, N.J.S.A. 2C:43-7.2. With one exception, the judge imposed the appropriate fines, penalties and assessments. The $50 VCCA assessments for aggravated manslaughter and carjacking should be $100 for each of those violent crimes, N.J.S.A. 2C:43-3.1.

On appeal defendant argues:

POINT I

A DEFECTIVE SELF-DEFENSE JURY CHARGE LIKELY
LED THE JURY TO INCORRECTLY BELIEVE THAT THE
DEFENSE APPLIED TO MURDER BUT NOT AGGRAVATED
MANSLAUGHTER, AND REQUIRES REVERSAL OF THE
CONVICTIONS. [NOT RAISED AT TRIAL]

POINT II

THE PITCHED CREDIBILITY BATTLE WAS UNFAIRLY
TIPPED IN FAVOR OF THE STATE BY THE COURT'S
IMPROPER INSTRUCTION ALLOWING THE JURY TO
DISCREDIT DEFENDANT BASED ON HIS AUNT'S
FAILURE TO INFORM THE POLICE OF DEFENDANT'S
SELF-DEFENSE. [NOT RAISED AT TRIAL]

POINT III

THE 25-YEAR NERA SENTENCE FOR AGGRAVATED
MANSLAUGHTER IS MANIFESTLY EXCESSIVE AND
SHOULD BE REDUCED.

Early in the morning on June 6, 2012, Kareem Montague's body and a knife with a six inch handle and an eleven and one-half inch blade serrated on one side, were found in the blood-soaked back seat of his car, which defendant had abandoned on a sidewalk in Newark. An autopsy disclosed a fatal injury and superficial defensive wounds consistent with that knife. Although the penetration was only two inches deep, the knife passed through Kareem's second rib, entered his pericardial sac, injured his anterior right ventricle and continued into his heart's cavity. In the opinion of the retired medical examiner

A-3518-14T4

who reviewed the autopsy, the injuries would have caused Kareem's death within minutes.

At trial, the State introduced physical evidence retrieved from Kareem's car implicating defendant — his wallet, driver's license, social security card and fingerprint. In addition, the State presented a surveillance video of the area near the spot Kareem's car was abandoned that showed defendant removing and discarding a sweatshirt stained with what was subsequently identified as Kareem's blood.

Defendant did not deny stabbing Kareem. During his testimony, he told the jurors he stabbed him, identified the knife and explained that he stabbed Kareem because he thought that either he or Kareem was going to be hurt. His only defense was self-defense, a use of force necessitated by Kareem's production of the knife and attempt to use it to injure him.

Charlene Fields, Kareem's girlfriend, and defendant were in the car when Kareem was stabbed. There was no testimony from any other eyewitness to the events that preceded the discovery of Kareem's body.

Fields, who testified for the State, and defendant, testifying on his own behalf, gave consistent accounts of what occurred before defendant got into Kareem's car.

A-3518-14T4

According to Fields, at approximately 1:00 a.m. on June 6, 2012, she was driving Kareem toward his home, when he received a cell phone call. Fields could not hear the conversation, but Kareem told her to turn around and take him to an address in Newark about a block off Orange Street. She found the place and double-parked, and defendant, whom Fields had seen before with Kareem and identified at trial, promptly approached.

Fields explained that Kareem distributed cigarettes dipped in embalming fluid, PCP, which he carried in small bottles with black tops. He charged $20 for each cigarette and generally made the transactions by lowering the car window.

Defendant acknowledged making the early morning call to Kareem and giving him his location. Awaiting Kareem's arrival, defendant saw Fields pull-up and double-park, and he approached the car. Defendant had seen Fields with Kareem on four or five prior occasions. He explained that he had a problem with PCP at that time and had been purchasing PCP-laced cigarettes from Kareem regularly for about a year, generally making the transaction at the window of Kareem's car.

Defendant's and Fields' recollections of what occurred after defendant reached Kareem's car were starkly different.

According to Fields, defendant approached and told Kareem "he was short with his money." Kareem assured defendant it was

"okay" and went about preparing a PCP soaked cigarette. By the time he dipped the cigarette, defendant, without invitation, had jumped into the car's back seat on the driver's side. Things quickly changed. Noticing Kareem looked scared, Fields thought defendant had something; he started to struggle with defendant and screamed, "What are you doing." As they tussled, Kareem asked Fields to drive. Assuming he wanted to get away, she complied. After about two blocks, Kareem said, "Baby, get me to the hospital. This [expletive], he stabbed me."

As Fields drove, "Kareem['s] body fell over the back seat" and defendant told her to "stop the [expletive] car," which she did. Defendant reached over and took the car key, and Fields saw a knife in his hand. Fields recalled the knife being bloody and a lot of blood in the back seat. Although she had been in Kareem's car many times, she had never seen the knife the State recovered there. In fact, she could not identify that knife as the one defendant held.

Fields recalled being in the back seat with Kareem, who was trying to breathe and talk, and getting out of the car. When Fields saw defendant, who was pacing outside the car and acting crazy, point the knife at her, she ran to a nearby gas station. Defendant drove away with Kareem in the backseat. At the gas

station, Fields encountered a woman who gave her water and called 911.

Defendant's account of the drug transaction and its aftermath was quite different.  He testified that there were people around when Fields and Kareem arrived, and Kareem told him to get in the car.  Complying, defendant went to the driver's side of the car because Kareem's seat was all the way back.  Inside, defendant took cash from his pocket and gave Kareem $16, instead of the usual $20.  He did that because he did not have much money and wanted to keep "the little extra dollars [he] had.  [He] didn't think it was going to be a problem, truthfully . . . ."

By his account, defendant misjudged Kareem's reaction.  On taking the cash, Kareem asked, "What is this only $16."  Although Kareem took the short payment, he was mad and told defendant to "stop playing" him.  Turning and cursing, Kareem grabbed defendant with both hands, got "aggressive," and snatched the wallet defendant had hooked to his pants' pocket.  Admitting he did not just sit there, defendant said they struggled, punched each other and scuffled for two or three minutes.  Then, backing away, Kareem reached for something, pulled the knife and, holding it in his right hand, lunged at defendant.

Using both hands, defendant got the knife from Kareem, swung it and stabbed him. He knew he hit Kareem with the knife, but did not know that it was "like in his heart or anywhere that was like - - was going to kill him." Kareem outweighed defendant by 111 pounds, but defendant did not think that mattered and could not or did not care to explain why he thought that was so.

By defendant's account, Fields drove the car away from the scene after Kareem collapsed on top of defendant in the back seat. At that point, Fields stopped the car and jumped out. Defendant slid from under Kareem, got out and, without saying anything to Fields, got into the car and drove away. After driving for about a minute, he left the car on the sidewalk and ran. As defendant ran, he threw his blood-covered sweatshirt on the ground and did not even know he had lost a shoe. When he realized he still had his cell phone, defendant called his aunt, and she picked him up. At that time, he was living with that aunt and his grandmother.

In defendant's view, the "[o]nly thing [he] probably could have [done] better was, you know, called the police as to - - or let them know. I mean, my side of the story, what happened."

Defendant's aunt testified. She confirmed defendant's early morning call for a ride, which he explained by telling her

something happened and he was in trouble. Defendant's aunt found him frantic, with blood on his T-shirt, missing a shoe and apparently scared. Thinking someone had "jumped" him, she suggested the hospital, but defendant told her he just wanted to go home.

According to the aunt, a car with four people inside stopped in front of their house two days later, and one got out and demanded to know where defendant was. Feeling threatened, she asked her mother to call the police, and the police responded.

The next day, defendant's aunt photographed defendant's injuries. For the first time that day, defendant told her about what happened. Although she thought defendant was the victim, she acknowledged that she did not give that information to the police.

Having discussed the evidence pertinent to the issues raised on appeal, we turn to consider defendant's objections to the jury instructions.

I.

On appeal defendant contends the instruction on self-defense was defective because it "likely led the jury to incorrectly believe that the defense applied to murder but not [to] aggravated manslaughter." There is no question that self-

defense is a defense to murder and to the lesser-included crimes of aggravated and reckless manslaughter. State v. Rodriguez, 195 N.J. 165, 175 (2008) (explaining that a jury should have been told to acquit the defendant of murder, aggravated manslaughter, and manslaughter, if it found the "State failed to prove beyond a reasonable doubt that defendant could not have reasonably believed in the need to use deadly force); see State v. Gentry, 439 N.J. Super. 57, 68 (App. Div. 2015) (reversing conviction because the jury was instructed that self-defense was a justification for murder but not told it was a defense to aggravated manslaughter or manslaughter).

In determining if there was error, we must consider whether the instruction, when read as a whole, clearly conveyed the elements of self-defense and its applicability to aggravated manslaughter. See State v. Singleton, 211 N.J. 157, 181–82 (2012) (noting that jury charges must comprehensibly explain the law applicable to the facts). Because defendant did not object at trial, our review is for plain error. R. 2:10-2. Plain error is error in a jury instruction with prejudicial impact on substantial rights that is "'sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Adams, 194 N.J. 186, 207 (2008)

(quoting State v. Jordan, 147 N.J. 409, 422 (1997) with citations omitted); accord State v. Camacho, 218 N.J. 533, 554 (2014).

Although murder was the only form of "criminal homicide" charged in the indictment, N.J.S.A. 2C:11-2, the judge also directed the jurors to consider aggravated manslaughter and reckless manslaughter. In each instruction on the elements of those crimes, the judge explained defendant's reliance on self-defense. In fact, there were two references to defendant's reliance on self-defense in the instructions on both aggravated manslaughter and manslaughter.

After explaining what the State was required to prove in order to establish the recklessness element of aggravated manslaughter and manslaughter, the judge advised: "In this case, the State alleges that [defendant] entered the car and stabbed Kareem . . . . The Defense alleges that Kareem . . . was stabbed as an act of self-defense after a fight ensued with the defendant."

The second reference in the aggravated manslaughter and manslaughter instructions followed the portions of those instructions describing the State's duty to prove, beyond a reasonable doubt, that Kareem's death "was not so unexpected or unusual that it would be unjust to find the defendant guilty of

aggravated manslaughter."  At that point, the judge reiterated,
"In this case, the State alleges that [defendant] entered the
car and stabbed Kareem . . . .  The [d]efense alleges that
Kareem . . . was stabbed as an act of self-defense after a fight
ensued with the defendant."

At the conclusion of the charge on reckless manslaughter
and following the repetitive references to self-defense, the
judge delivered the instruction on self-defense.

The first paragraph of the self-defense instruction
explained:  "the indictment charges that the defendant committed
the crime of homicide.  The defendant contends that if . . . the
State proves he used . . . or threatened to use force upon the
order person, that such force was justifiable - - justifiably
used for his protection."  Consistent with Rodriquez, the court
concluded the self-defense instruction by directing, "If the
State does not satisfy this burden . . . and you do have a
reasonable doubt, then it must be resolved in favor of the
defendant, and you must allow the claim of self-defense and
acquit the defendant."

We have no doubt that these jurors, who had been told
multiple times that defendant was claiming self-defense as a
defense to murder and to aggravated and reckless manslaughter,
understood the defense was available to all three crimes.  We

12                                                    A-3518-14T4

are confident that the jurors understood acquittal was required if the State failed to prove that defendant did not act in self-defense. Defendant's arguments to the contrary has insufficient merit to warrant any additional discussion. R. 2:11-3(e)(2).

## II.

Defendant also claims error in the judge's charge on his and his aunt's failure to call the police and report that Kareem had attacked him. Here, he contends that the instruction unfairly tipped the credibility battle in favor of the State.

The instruction at issue was as follows:

> You heard testimony from [defendant's aunt] and [defendant] that the defendant did not contact law enforcement after the alleged crime to inform them that he was a victim in the incident. This evidence may only be used in determining the credibility of the defendant. [T]his testimony was allowed in evidence for the sole purpose of affecting the credibility of the defendant and for no other purpose.

> You are not, however, obligated to change your opinion as to the credibility of the defendant simply because he did not contact the police after the incident. You may consider such evidence, along with all the other factors we previously discussed, in determining the credibility of the defendant.

Defense counsel did not object at the time, and again our review is for plain error. The question is whether, after considering the charge as a whole, we are convinced that

13

impropriety in the charge had a clear capacity to produce an unjust result. Adams, supra, 194 N.J. at 207.

The instruction addresses credibility, not an element of a crime or defense material to guilt, and it does not implicate defendant's Federal Constitutional right to remain silent, U.S. Const. amend. V, or the State's privilege against self-incrimination "codified in both statute and an evidence rule." State v. Muhammad, 182 N.J. 551, 567 (2005) (referencing N.J.S.A. 2A:84A-19 and N.J.R.E. 503).

On the evidence in this case, the court properly permitted the prosecutor to impeach defendant's testimony on self-defense by questioning him about his failure to report Kareem's attack. State v. Brown, 190 N.J. 144, 158-59 (2007). Defendant recognized this himself when he told the jurors that the thing he could have done better was to go to the police and tell his side of the story. The evidence established "objective circumstances" demonstrating that a "reasonable person" in defendant's "situation" would have gone to police. Ibid. The question is admittedly closer with respect to impeachment of defendant's aunt, who had no personal knowledge of the events and could only report what defendant had told her.

The instruction defendant finds objectionable was a limiting instruction. It explained that the evidence was

14

admitted for the jurors' consideration in assessing credibility and directed the jurors not to use that evidence for any other purpose.

Even if we were to conclude the judge should not have linked the credibility of defendant and his aunt in this instruction, we would not have any doubt that the reference to the aunt's recalcitrance could not have had any impact on this verdict. We are certain that the instruction did not, as defendant argues, have the clear capacity to unfairly tip the credibility battle in the State's favor.

### III.

Defendant argues that his aggregate twenty-five year sentence is excessive. As noted at the outset of this opinion, the judge merged defendant's convictions for aggravated manslaughter and possession of a knife with an unlawful purpose and sentenced him to concurrent terms of imprisonment for first-degree carjacking, first-degree aggravated manslaughter, and fourth-degree unlawful possession of a knife.

The Legislature has provided a sentencing range for aggravated manslaughter and carjacking that is greater than the ordinary range for crimes of the first degree, which is ten to twenty years, N.J.S.A. 2C:43-6(a)(1). For these first-degree crimes, the range is ten to thirty years. N.J.S.A. 2C:11-4(c);

15                                                    A-3518-14T4

N.J.S.A. 2C:15-2(b). In addition, both crimes are subject to terms of parole ineligibility and supervision required by the No Early Release Act, N.J.S.A. 2C:43-7.2(d)(2),(10).

After hearing counsel's argument and statements from members of the victim's family, his children's mother and defendant, the judge made these findings and provides the reasons:

> Mr. Bedford I have reviewed your pre-sentence report. I note that you are 23 years old. You attended Clifford Scott until the ninth grade and then subsequently received your GED and you did a semester at Essex County College.
>
> You have 18 adult arrests, 5 juvenile adjudications, 5 adult arrests. I sat through this trial and to say the circumstances that occurred was anything less than a tragedy, a tragedy for everyone. Obviously a tragedy for the victim, obviously a tragedy for the victim's family, obviously a tragedy for the defendant and his family. There's been nothing but a lot of losses here.
>
> [Interjection omitted.]
>
> There's been nothing but a lot of losses here. However, I note the age of 23 and unfortunately what one does at one age is not what somebody would do at another age. And life is about redemption and life is about having a grain of hope somewhere. It is a tragedy that this happened.
>
> [The judge's listing of correspondence received is omitted.]

16

And I understand that the only two people that really understand - - know what went on were the two people that were involved in this incident. One cannot speak for themselves. We are bound by a jury's verdict that has ruled on this matter and heard the case in front - - in front of them.

I find that there are no mitigating factors. I find the following aggravating factors. There is a risk that the defendant may commit another offense. The extent of the defendant's prior juvenile and criminal record and the seriousness of those offenses for which he had been previously convicted. And the need to deter he and others from violating the law.

In State v. Fuentes, 217 N.J. 57, 74 (2014), the Court explained:

A careful statement of reasons . . . facilitates appellate review. The trial court's explanation of its reasoning "is important for meaningful appellate review of any criminal sentence challenged for excessiveness," because the appellate court "is expected to assess the aggravating and mitigating factors to determine whether they 'were based upon competent credible evidence in the record.'" [State v. Bieniek, 200 N.J. 601, 608 (2010)(quoting [State v. Roth, 95 N.J. 334, 364 (1984)]. A clear and detailed statement of reasons is thus a crucial component of the process conducted by the sentencing court, and a prerequisite to effective appellate review.

We note the defendant was twenty years old when he committed these crimes, and we understand he had prior adjudications for delinquency, including one disposition that

provided for eighteen months at the Jamesburg Training School. We also recognize that defendant was arrested several times after he committed these crimes and before he was sentenced.

Apart from the fact that the jurors rejected defendant's claim of self-defense, we are unable to determine why the judge found no mitigating factors or determined that the three aggravating factors she identified, N.J.S.A. 2C:44-1(a)(3), (6), (9), qualitatively analyzed, warranted a sentence so near the top of the ten to thirty range. See Fuentes, supra, 217 N.J. at 70-81.

In short, the judge's statement is inadequate to permit effective appellate review. Accordingly, we remand for further explanation in accordance with Fuentes and the cases discussed in that opinion. On remand, the judge also must correct the $50 VCCA assessments for aggravated manslaughter and carjacking, which should be $100 for each of those violent crimes, N.J.S.A. 2C:43-3.1.

Affirmed in part and remanded for resentencing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3518-14T4