**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1527-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHARLES T. LEDBETTER, a/k/a
CHARLES T. LEADBETTER,

    Defendant-Appellant.

_____

Submitted October 17, 2018 – Decided January 29, 2019

Before Judges Alvarez and Nugent.

On appeal from Superior Court of New Jersey, Law Division, Salem County, Indictment No. 14-09-0508.

Joseph E. Krakora, Public Defender, attorney for appellant (Alicia J. Hubbard, Assistant Deputy Public Defender, of counsel and on the briefs).

John T. Lenahan, Salem County Prosecutor, attorney for respondent (David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Charles Ledbetter was convicted of second, third, and fourth-degree aggravated assault (counts two, three, and four of the indictment), N.J.S.A. 2C:12-1(b)(1)-(3); third-degree endangering an impaired or helpless person (count five), N.J.S.A. 2C:12-1.2(a); and third-degree possession of a weapon for an unlawful purpose (count seven), N.J.S.A. 2C:39-4. Defendant was sentenced October 30, 2015, as a persistent offender, to fourteen years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a consecutive term of five years, two years without parole, on the endangering count. Thus defendant's aggregate sentence was nineteen years imprisonment, with a fourteen-year parole disqualifier. We affirm.

The victim, M.W., was acquainted with defendant from the neighborhood. She was friendly with defendant's girlfriend, Natonya Lusby, and had previously seen defendant, both day and night, over a dozen times. The evening the incident occurred, M.W. had been drinking and smoking marijuana with friends in the neighborhood, including Timothy Taylor. Despite her intoxication, M.W. testified that she was "fine" and "coherent." At around 11:00 p.m., when M.W. heard "a commotion," she went outside and saw Taylor arguing with defendant and others. M.W. told the men to take it elsewhere. A few minutes later, when M.W. walked outside, she saw Taylor on the ground while defendant and two

others stood over him. M.W. attempted to intercede, and during the ensuing five to ten-minute altercation, M.W. was "face to face" with defendant. Eventually, defendant and his friends walked away. M.W. and Taylor went back inside her home.

After midnight, Lusby and one of her friends encountered defendant on the street. He told Lusby, as she recounted during trial, that he had just had a fight with Taylor and M.W., and that M.W. had hit and grabbed him, and pulled his hair. He told Lusby to "handle that." Defendant and his companions walked down the street.

M.W. was seated outside of a duplex where Lusby's mother lived, waiting for the delivery of cigarettes she had paid for when she suddenly felt a punch to the back of her head. When she turned around, she saw Lusby, and the two women fell to the ground. Lusby's friend started kicking both women. As she tried to get up, M.W. said Lusby also started kicking her, as were two others. She noticed defendant walking quickly towards her around the side of the house with a gray pitbull by his side. He had the leash wrapped around his hand to the collar.

Defendant held the pitbull to M.W.'s face, repeatedly punching her and the dog until finally the dog began to bite her. The dog locked onto the left side

of her face, and M.W. said despite the attack, she was still being kicked. When M.W. turned her face, the dog then locked onto the other side. Police were called, and the attack ended abruptly. M.W. was immediately taken to the emergency room. One of the officers who arrived could see M.W.'s teeth and jawbone through a sizable hole in her face. Although she could not speak, when the officer asked her if she knew who had done this to her, she nodded.

M.W.'s injuries were extensive, disfiguring, and resulted in the paralysis of one side of her face and multiple reconstructive surgeries, with more to come. The following morning, an investigator arrived who had known M.W. for twenty-three years. She was lethargic and in obvious pain. Because she did not want to become the subject of retaliation, she initially told the officer she did not know the identity of her attacker. Eventually, however, M.W. admitted that "Cheddar," defendant's nickname, was the person who forced the dog on her. The officer, who had known defendant for over a decade, immediately connected the nickname to defendant, who lived one street over from the location of the incident. The following day, the officer returned to the hospital with another investigator.

Although heavily medicated and still in much pain, M.W. again identified "Cheddar" as the attacker, and described his physical appearance and attire that

night. The following day, approximately three days after the assault, the officer showed M.W. a photograph of defendant with his identifiers folded underneath and asked if she knew who he was. She responded that it was Cheddar, "that's him." The officer testified at the Wade[1] hearing that no photo array was presented because M.W. knew the suspect. Defendant and Lusby were eventually arrested. When asked about the dog, Lusby said to ask defendant because she had nothing to do with it. She later entered into a plea agreement, and then said that defendant had a black pitbull on a leash, and was hitting it while it bit M.W. At trial, Lusby modified her account. She then said defendant was punching the dog in order to stop him from biting M.W.

On January 16, 2015, in response to defendant's motion, Judge Timothy G. Farrell conducted a hearing to suppress the out-of-court identification. He concluded that showing M.W. one photograph was impermissibly suggestive within the meaning of State v. Henderson, 208 N.J. 208 (2011). At the close of the hearing, at which the police officers who interviewed M.W. and Lusby testified, the judge concluded that because M.W. was socially acquainted with defendant prior to the incident, the manner in which she was shown his photograph "would not likely lead to a mistaken identification." Judge Farrell

---

[1] U.S. v. Wade, 388 U.S. 218 (1967).

A-1527-15T4

analyzed each prong of <u>Henderson</u> as it applied to the evidence, including the neutral fashion in which the officers presented the photograph to M.W. and the fact all of M.W.'s interviews were tape recorded while she was hospitalized. Judge Farrell stated that not only had defendant failed to establish a likelihood of irreparable misidentification, the identification by the victim was "sufficiently reliable to be admissible at trial; and, would [warrant] both the out-of-court identification and if appropriate, an in-court identification[,] to be admitted."

The last day of trial, Judge Benjamin C. Telsey advised counsel that draft charges would be provided for their review before closing arguments. Only the prosecutor requested a special charge, that being a tailored aggravated assault instruction. When trial resumed, the court provided a second set of the jury instructions as modified after the charge conference. Defendant made no requests.

The following day, after closing arguments, Judge Telsey advised that he would be issuing in-court and out-of-court identification instructions, although not requested by the attorneys. Defendant approved the draft of the instruction. The court therefore delivered a ten-page identification charge substantially conforming to the model jury charge for in-court and out-of-court identification

drafted post-<u>Henderson</u>. <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Identification: In-Court And Out-Of-Court Identifications" (Rev. July 19, 2012).

When defendant was sentenced, the court granted the State's persistent offender extended-term application pursuant to N.J.S.A. 2C:44-3. Defendant had an extensive juvenile history beginning in 1996, and at least six prior indictable convictions as an adult. The judge therefore found that defendant met the baseline qualifications under the statute. In sentencing, Judge Telsey found aggravating factor one, the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1); three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, the extent of defendant's prior criminal record and the seriousness of the offenses, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9).

Judge Telsey also found in mitigation factor four, that substantial grounds tending to excuse or justify defendant's conduct existed based on defendant's unspecified mental health issues. <u>See</u> N.J.S.A. 2C:44-1(b)(4). Those mental health issues established defendant's eligibility for Social Security disability benefits. The judge also found factor six in mitigation, that defendant would compensate the victim, N.J.S.A. 2C:44-1(b)(6). Because he concluded the aggravating factors substantially outweighed the mitigating, Judge Telsey

7

sentenced defendant to a NERA fourteen years, in the mid-range of first-degree offenses. As required by the mandatory provisions of N.J.S.A. 2C:12-1.2(d), he sentenced defendant to a consecutive mandatory five-year term subject to two years of parole ineligibility.

On appeal, defendant raises the following points:

POINT I

THE COURT ALLOWED THE JURY TO CONSIDER AN UNRELIABLE OUT-OF-COURT IDENTIFICATION, DESPITE THERE BEING A SUBSTANTIAL LIKELIHOOD OF MISIDENTIFICATION, AND COMPOUNDED THE PROBLEM BY FAILING TO PROVIDE THE FACT FINDERS WITH APPROPRIATE JURY INSTRUCTIONS ON HOW TO CONSIDER THE EVIDENCE. (U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, ¶¶ 9, 10)

A. Admission of an Unreliable Identification.

B. Failure to Provide Appropriate Jury Instructions.

POINT II

THE FAILURE OF THE TRIAL COURT TO PROVIDE THE JURY WITH AN INSTRUCTION ON HOW TO CONSIDER WHAT WEIGHT, IF ANY, TO ATTRIBUTE TO [DEFENDANT]'S ALLEGED STATEMENT THAT HE TOLD HIS CO-DEFENDANT THAT [M.W.] HAD ACCOSTED HIM AND THEN ASKED THE CO-DEFENDANT TO "HANDLE" MS. M.W., DENIED [DEFENDANT] A FAIR TRIAL AND DUE PROCESS. (U.S. CONST.

8

AMEND. V, VI AND XIV; <u>N.J. CONST.</u> (1947), ART.
I, ¶ 10)

POINT III

THE CUMULATIVE IMPACT OF THE ERRORS
DENIED DEFENDANT A FAIR TRIAL.

POINT IV

AN EXCESSIVE SENTENCE WAS IMPOSED
AFTER THE COURT FAILED TO CONSIDER
APPLICABLE MITIGATING FACTORS.

POINT V

THE TRIAL COURT'S ORDER TO PAY
RESTITUTION WITHOUT FIRST CONSIDERING
[DEFENDANT'S] ABILITY TO PAY AND THE
ORDER TO PAY OUT OF FUNDS DERIVED
WHOLLY FROM SOCIAL SECURITY DISABILITY
BENEFITS VIOLATED THE NEW JERSEY
CRIMINAL CODE AND THE FEDERAL ANTI-
ALIENATION PROVISIONS CONCERNING
SOCIAL SECURITY BENEFITS (<u>U.S. Const.</u> art. IV,
c1.2).

A. The Court Failed To Make A Determination Of
[Defendant's] Ability To Pay, As Required by N.J.S.A.
2C:44-2.

B. The Court's Imposition of Restitution from Income
De[riving] Wholly from Social Security Disability
Benefits Contravened Federal Law.

## I.

In order to demonstrate that he or she is entitled to a <u>Wade</u> hearing, a defendant must offer some evidence of impermissible suggestiveness. <u>Henderson</u>, 208 N.J. at 238. That evidence may be linked to system variables, in other words, those factors within the control of the criminal justice system. <u>Id.</u> at 247; 288-89. This is in contrast to estimator variables, which are factors over which the legal system has no control. <u>Id.</u> at 247. In order to decide whether a hearing is warranted, a court must first assess whether the identification procedures may have resulted in a mistaken identification. <u>Id.</u> at 288. Once a judge decides to conduct a hearing, the issue becomes whether the procedure resulted in a "very substantial likelihood of irreparable misidentification." <u>State v. Micelli</u>, 215 N.J. 284, 287 (2013) (citation omitted).

The burden shifts to the State to prove by "clear and convincing evidence that the identification[] . . . had a source independent of the police-conducted identification procedures." <u>State v. Madison</u>, 109 N.J. 223, 245 (1988) (citing <u>Wade</u>, 388 U.S. at 240). However, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." <u>Henderson</u>, 208 N.J. at 289.

A-1527-15T4

In this case, the Wade hearing was necessary. Defendant demonstrated some evidence of suggestiveness in that only one photograph was shown to M.W. Id. at 288. But, once the court heard the officers' testimony, and considered each and every Henderson factor, his conclusion that no possibility of irreparable misidentification existed was unassailable.

M.W.'s use of marijuana and alcohol on the night in question, did not, according to her testimony, affect her ability to identify defendant. It is sheer speculation to suggest that it would have led her to misidentify an acquaintance. Furthermore, even the administration of powerful anti-pain killers subsequent to the attack would not have caused such confusion.

As the judge said, M.W. was acquainted with defendant, knew with whom she was dealing, stated from the onset that she knew the person who forced the dog to attack her even though she did not know his last name, and although she was shown only one photograph, was shown that photograph in a neutral manner. The issue is not whether defendant's picture should have been included in a photo array. The issue is whether in the manner in which it was shown, any possibility of misidentification arose. The court's findings, supported by the record, should not be disturbed. The interests of justice do not demand intervention or correction. See State v. Elders, 192 N.J. 224, 244 (2007)

(quoting State v. Johnson, 42 N.J. 146, 162 (1964)). There is no merit to defendant's contention that the court erred by admitting an unreliable identification.

## II.

If an error has not been brought to the trial court's attention, we will not reverse unless the appellant shows plain error, or error "clearly capable of producing an unjust result." R. 2:10-2. In relation to jury instructions, plain error is "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969))).

It is beyond dispute that proper identification instructions are essential in all cases, and particularly those upon which the prosecution is based on identification evidence:

> [w]hen identification is a "key issue", the trial court must instruct the jury on identification, even if a defendant does not make that request. Identification becomes a key issue when "[i]t [is] the major . . . thrust of the defense," particularly in cases where the State relies on a single victim-eyewitness.

12

[State v. Cotto, 182 N.J. 316, 325-26 (2005) (citations omitted).]

Moreover, "[t]he charge to the jury must be read as a whole in determining whether there was any error." State v. Adams, 194 N.J. 186, 207 (2008). Additionally, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances— including all the instructions to the jury, [and] the arguments of counsel." Ibid. (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)).

Defendant argues that the "trial court compounded the problem of the admission of the unreliable identification by giving inadequate jury instructions on the issue of identification." Defendant contends that the model jury charge for identification, which includes the "double-blind," "showup," and "fillers" language, should have been presented to the jury. Defendant also maintains that the "court never tailored the identification instruction about how the ingestion of substances can affect reliability to include drugs, as footnote twelve in the model instruction states the court may do."

The trial court gave the jury comprehensive, relevant instructions on in-court and out-of-court identifications, which were reviewed and approved by

defendant. See State v. McGraw, 129 N.J. 68, 80 (1992) (finding that trial counsel's acceptance of the charge drafted by the court indicates that counsel did not view the alleged error on appeal as prejudicial to the defense).

Further, as a plain reading of the "double-blind" and "fillers" charges reveals, these charges are reserved for cases in which a lineup is used. They are not intended for the identification procedure employed here, where M.W. initially identified the suspect by nickname, and where the officer's act of showing M.W. a photo of the person associated with that nickname was simply a confirmation process.

Defendant's claim that the court should have charged the jury on "showup" is also unpersuasive. The process the officers followed here was not a showup as relevant to the instruction. The showup instruction, which advises that "the witness identified the defendant during a 'showup,'" would have been misleading and prejudicial to the State. It would have suggested that M.W. could not identify her assailant until his picture was shown to her, when the opposite was true. She supplied defendant's nickname, and the officers showed her a photograph of that person for confirmation.

In any event, in both his opening and closing statements, defendant stressed the potential for a mistaken identification because the police only

presented M.W. with a single photograph.  A jury charge must be considered "in light of the arguments made by trial counsel, as those arguments can mitigate prejudice resulting from a less-than-perfect charge."  State v. Robinson, 165 N.J. 32, 47 (2000) (citing State v. Morton, 155 N.J. 383, 423 (1998)).  In arguing "unreliable identification" in his opening statements, defendant maintained that the State "implanted [defendant] in [M.W.'s] brain" by only showing one photograph instead of an array.  In closing, defendant emphasized the lack of a photo array, the "power of suggestion" from showing a single photograph, the "social" connection between M.W. and the officer who interviewed her, and M.W.'s bias against defendant as a result of the fight with Taylor.  Thus, any possible prejudice from the omission of the above instructions was mitigated by defendant's comments.

Finally, defendant maintains that the court should have tailored the identification instruction to M.W.'s alcohol and drug use.  The court gave the standard "intoxication" instruction, which states that

> [t]he influence of alcohol can affect the reliability of an identification. An identification made by a witness under the influence of a high level of alcohol at the time of the incident tends to be more unreliable than an identification by a witness who drank a small amount of alcohol.

15

> [Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012).]

With regard to M.W.'s use of powerful painkillers, they were not administered until after the offense. The intoxication instruction focuses on intoxication "at the time of the incident." Indeed, "intoxication" is a sub-factor to the factor "witness's opportunity to view and degree of attention," which "assess[es] the witness's opportunity to view the person who committed the offense at the time of the offense and the witness's degree of attention to the perpetrator at the time of the offense."

Moreover, defendant repeatedly referenced M.W.'s drug use. During opening, defendant argued that M.W. smoked marijuana before the incident, "inducing an altered state of consciousness, which has a[n] impact on your perception." In summation, defendant again maintained that drinking and smoking marijuana could have impacted M.W.'s perception, particularly at night. Counsel's arguments mitigated the minimal possibility that the jury would not have considered marijuana use when assessing the reliability of M.W.'s identification. See Robinson, 165 N.J. at 47. The argument that the omission of marijuana from the instruction prejudiced the outcome has no merit.

16

Defendant also contends that the State's remark minimizing the significance of M.W.'s use of alcohol and marijuana was an improper and unfair response to defendant's repeated assertions. However, the State is permitted to give a "measured response" to allegations made by defendant in summation. State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001); see also State v. Darrian, 255 N.J. Super. 435, 454-55 (App. Div. 1992); State v. Engel, 249 N.J. Super. 336, 379-80 (App. Div. 1991). Here, the State's remarks were "invited" as a response to the summation offered by defendant and did no more than "right the scale." Engel, 249 N.J. Super. at 379; United States v. Young, 470 U.S. 1, 12-13 (1985); State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001). The prosecutor's remark that the alcohol and marijuana did not affect her thinking was also a fair comment on the evidence, as M.W. testified that she was "fine" and "coherent" after having a couple of alcoholic drinks and sharing a blunt. There was no error in the jury charge. Certainly not error "clearly capable of producing an unjust result." See R. 2:10-2.

### III.

Nor did the trial court err in omitting the Hampton/Kociolek charge. Defendant contends the trial court should have given a jury instruction on defendant's alleged oral statement to his co-defendant that she "handle that."

Such omissions constitute reversible error "only when, in the context of the entire case, the omission is 'clearly capable of producing an unjust result.'" State v. Jordan, 147 N.J. 409, 425 (1997) (quoting R. 2:10-2). If "the defendant's statement is unnecessary to prove defendant's guilt because there is other evidence that clearly establishes guilt, . . . the failure to give a Hampton charge would not be reversible error." Id. at 425-26.

In this case, defendant did not request either a Hampton or Kociolek instruction. Since no objection was heard at the time the charge was given, we presume no error occurred likely to prejudice defendant's case. State v. Singleton, 211 N.J. 157, 182 (2012). The presumption controls here. Defense counsel was involved in at least two formal on-the-record charge conferences, and given at least two separate drafts of the jury instructions. During closing, defendant actually used the statement he made to Lusby that she "handle" M.W. to his benefit. He argued that by making the request, he gave Lusby the responsibility to obtain revenge. Defendant made a strategic decision to use the statement to his benefit. He cannot now successfully maintain that the omission of the instructions, which call upon juries to examine such statements very closely because of the possibility they were not made or misheard, was prejudicial error.

The court did charge the jury regarding witness credibility and prior contradictory statements. The court instructed the jury on how to evaluate the testimony. The court delivered the general credibility instruction advising the jury to consider a number of factors, including the witness's appearance and demeanor, bias, power of discernment, ability to observe and recollect, and whether the witness's testimony was supported or unsupported by other evidence. See Model Jury Charges (Criminal), "General Information as to Credibility of Witnesses" (revised May 12, 2014). The final charge included specific instructions as to the witnesses' prior inconsistent statements. See Model Jury Charges (Criminal), "Credibility: Prior Contradictory Statements of Witnesses (Not Defendant)" (approved May 23, 1994). The final charge also instructed the jury to consider the witnesses' prior convictions. See Model Jury Charges (Criminal), "Credibility: Prior Conviction of a Witness" (revised February 24, 2003). The charge adequately conveyed to the jury the information necessary to evaluate each witness's testimony.

IV.

We do not address defendant's cumulative error argument as we consider it to be so lacking in merit as to not warrant discussion in a written opinion. See R. 2:11-3(e)(2).

19

In challenging his sentence, defendant focuses upon mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11). Clearly, as the judge said, nothing about this defendant's relationship to his family warranted consideration of that factor, which requires extraordinary circumstances. Every defendant who is incarcerated causes great hardship to his family and loved ones due to his imprisonment. See State v. Dalziel, 182 N.J. 494, 505 (2005).

Moreover, a defendant's sentence is subject to "limited appellate review" where the trial judge "properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Cassady, 198 N.J. 165, 180 (2009) (quoting State v. O'Donnell, 117 N.J. 210, 215 (1989)). This court must not "second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." O'Donnell, 117 N.J. at 216.

In the end, where the sentence is reasonable, we are "bound to affirm a sentence, even if [the appellate court] would have arrived at a different result." Cassady, 198 N.J. at 180 (quoting O'Donnell, 117 N.J. at 215). We do not "substitute [our] judgment for that of the trial court." Ibid. (quoting State v.

Evers, 175 N.J. 355, 386 (2003)). If the sentencing court's findings of facts are grounded in competent, reasonably credible evidence and the court has applied correct legal principles in exercising its discretion, then we modify the sentence only if application of the facts to the law is such a clear error of judgment that it "shocks the judicial conscience." State v. Roth, 95 N.J. 334, 363-65 (1984).

The sentence in this case was supported by aggravating and mitigating factors, which in turn were supported by evidence in the record. No error of judgment occurred, much less a clear error of judgment. The court correctly applied legal principles to the facts.

VI.

Finally, defendant contends that defendant should not have been ordered to pay restitution as his sole source of income was his Social Security disability benefits, which are not subject to garnishment. We do not reach that argument as in fact according to 42 U.S.C. § 402(x), incarcerated persons who receive disability benefits generally forfeit their benefits during incarceration. See 20 C.F.R. § 404.468 (2017). Even if that were not the case, the amount of restitution that the court ordered, $8593.69 was payable to the Violent Crimes Compensation Board (VCCB), as it had paid that amount to M.W. for medical and dental treatment. Under N.J.S.A. 2C:44-2(c)(2), a sentencing court is

required to order a "defendant to pay any restitution ordered for a loss previously compensated by the Board to the [VCCB]." N.J.S.A. 2C:44-2(c)(2). Thus, defendant is obligated to pay restitution, not to the victim, but to the VCCB. This point also lacks merit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1527-15T4