**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3313-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAVID D. MARTINEZ,

    Defendant-Appellant.

_____

Submitted November 12, 2025 – Decided March 12, 2026

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-09-1080.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant David Martinez was convicted of felony murder, armed robbery, conspiracy to commit armed robbery, and weapons offenses stemming from the fatal shooting of David Duque-Soto during a robbery at the victim's apartment. Defendant was sentenced to an aggregate term of thirty years in prison, with a thirty-year period of parole ineligibility.

The State's proofs showed that defendant and three codefendants, Lexie Burke, Raul Torres, and Carlos Burgos, planned to rob Duque-Soto, an alleged drug dealer, at gunpoint. Burke testified for the State pursuant to a negotiated plea agreement and described the planning and the events surrounding the shooting. A fourth codefendant, Dylan Rodriguez, was also involved. Defendant, who served as the get-away driver, did not testify at trial. His defense was that he and the codefendants did not intend a robbery but rather "a snatch and grab," which was at most a theft.

On appeal, defendant raises the following Points for our consideration:

POINT I

DEFENDANT'S REQUEST FOR A LESSER-INCLUDED-OFFENSE INSTRUCTION ON CONSPIRACY TO COMMIT THEFT SHOULD HAVE BEEN GRANTED BECAUSE THERE WAS A RATIONAL BASIS IN THE RECORD FOR THE JURY TO ACQUIT DEFENDANT OF THE CONSPIRACY TO COMMIT ARMED ROBBERY AND CONVICT HIM OF THE LESSER

2

CONSPIRACY TO DO A "SNATCH AND GRAB" THEFT. THE RESULTING HARM FROM THE IMPROPER DENIAL OF THAT REQUEST TAINTS ALL OF . . . DEFENDANT'S CONVICTIONS, WHICH SHOULD BE REVERSED AND THE MATTER REMANDED FOR RETRIAL.

POINT II

THE STATE IMPROPERLY INTRODUCED LAY-OPINION TESTIMONY FROM A DETECTIVE THAT VOUCHED FOR THE TRUTH OF THE TESTIMONY OF THE STATE'S MAIN WITNESS.

POINT III

WHILE DECADES OF CASE LAW HAVE HELD, WITH LITTLE DISCUSSION, THAT, IN NEW JERSEY, FELONY MURDER UNDER TITLE 2C IS A STRICT-LIABILITY OFFENSE WITH NO MENS REA REQUIREMENT TOWARD THE CAUSING OF DEATH, THE APPLICABLE STATUTES CLEARLY SAY OTHERWISE – REQUIRING THAT FELONY MURDER BE COMMITTED WITH A MINIMUM MENS REA OF "RECKLESS" TOWARD THE CAUSING OF DEATH. CONSEQUENTLY, THE JURY INSTRUCTIONS HERE REGARDING THE MENTAL-STATE ELEMENT OF FELONY MURDER WERE INCORRECT AS A MATTER OF PLAIN ERROR. (NOT RAISED BELOW)

POINT IV

THE JUDGMENT OF CONVICTION DOES NOT REFLECT THE SENTENCE THAT WAS IMPOSED IN COURT AND SHOULD BE AMENDED. (NOT RAISED BELOW)

We have considered these arguments in light of the record and applicable legal principles. We affirm defendant's convictions and sentence but remand for the limited purpose of correcting the judgment of conviction (JOC).

I.

On September 26, 2019, a Bergen County grand jury returned an indictment charging defendant and several codefendants with first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count one); second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:15-1(a)(1) (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count six).[1]

Prior to defendant's trial, codefendant Burke was tried separately. Before the jury returned a verdict, Burke entered a negotiated guilty plea to aggravated manslaughter, robbery, conspiracy to commit robbery, and weapons charges. Pursuant to the plea agreement, Burke was required to testify truthfully at future

---

[1] Codefendants Burke, Torres, and Burgos were charged with the same crimes as defendant. Torres and Rodriguez were charged with crimes that are not pertinent to this appeal.

A-3313-22

trials. Following Burke's guilty plea, defendant's case was severed from the other codefendants' and scheduled for trial. Pre-trial, the trial judge dismissed the murder charge against defendant. We glean these facts from the ensuing trial conducted from February 7 to March 13, 2023.

Fairview Police Officer Michael DeCarlo, a dispatcher with the Fairview Police Department (FPD), testified that at 7:50 p.m. on June 29, 2019, two West New York police officers arrived at the FPD headquarters with Erick Euceda, who had reported a shooting in an apartment in Fairview. According to DeCarlo, Euceda was "nervous" and "appeared [to be] in shock." Thereafter, DeCarlo and other officers drove to the apartment Euceda described on 4th Street in Fairview. Inside, they discovered the apartment "was in complete disarray." "[L]ying on his back in the middle of the room" in "a pool of blood," the officers observed "a body . . . later identified as . . . Duque-Soto."

Dr. Stephen DeRoux, the medical examiner, testified Duque-Soto suffered several gunshot wounds. According to DeRoux, the fatal shot entered at Duque-Soto's shoulder and perforated the left lung and spinal cord. Two projectiles were recovered during the autopsy—one near the left shoulder blade and the other "by the vertebral column." DeRoux explained that both were "small caliber" bullets, .22 or .32 caliber. He also testified Duque-Soto had "a bunch"

of blunt-force injuries to his chest and abdomen that were contemporaneous with the gunshot wounds.

Euceda testified he was friends with Duque-Soto and was with him on June 29, 2019. They were hanging out in Duque-Soto's Fairview apartment and planned to drink beer, smoke marijuana, and go to West New York. According to Euceda, Duque-Soto left the apartment "to buy some weed," and returned a short time later with a "person that had a type of dark skin" and an "[a]fro." The man left the apartment to get more marijuana to sell to Duque-Soto and returned "about 30 minutes" later with two other people. Euceda testified when he saw one of the two individuals had a gun, he ran to the bathroom to hide. While inside the bathroom, he heard noises, "like they were moving things," and then he heard gunshots. After a "lot of time had gone by," Euceda exited the bathroom and found Duque-Soto unresponsive on the floor "in a pool of blood." Although Euceda was initially afraid to get involved, he ultimately called the West New York Police Department to report the shooting. Two officers brought him to FPD headquarters.

Bergen County Prosecutor's Office (BCPO) Lieutenant Kevin Dempsey described the "disorganized" mess he observed in Duque-Soto's apartment when he arrived at the scene. He testified a couch was "flipped over," a bicycle was

lying on its side, "stuff [was] scattered throughout the floor," Duque-Soto was "laying in front of the couch on his back with . . . two pillow[s] covering him," and "[a] bunch of . . . debris [was strewn] on the table." A search of the apartment by law enforcement recovered an iPhone; "multiple" other cell phones; bullet fragments; a spent .32 caliber shell casing; two unused 9 mm bullets; other unused bullets of various calibers, including .22 caliber and .45 caliber; a 9 mm spent shell casing; "baggies filled with white powder"; marijuana; $4,300 in cash in a backpack in a closet; and a loaded silver .22 caliber handgun inside a bag in the "back cushion area" of a couch.

Initially, the investigation led to the arrests of codefendants Burgos, Rodriguez, and Burke. In accordance with his plea agreement, Burke testified for the State, recounting that in June 2019, he was "selling weed" and he and defendant referred "weed" customers to each other. Burke testified he would post about marijuana sales on Instagram and Snapchat, and Duque-Soto had contacted him expressing an interest in buying "a pound of weed" for about $2,000. Contrary to a prior exculpatory statement he had given to law enforcement, Burke testified he contacted defendant on June 28, 2019, about possibly robbing Duque-Soto and defendant was "pretty gung-ho about it." In a

text exchange between the two, referring to Duque-Soto, Burke texted, "We robbing his stupid ass," and defendant responded, "WHERE HE AT."

Burke testified he and defendant continued texting about the robbery over the next two days—June 28 and 29. He told defendant they needed "a gun and a car" and told defendant to "[g]et a grip," referring to a gun. Defendant responded "IK," which meant "I know," and later told Burke he was trying to rent a "glizza," which was slang for a Glock handgun. Defendant told Burke a mutual friend, codefendant Rodriguez, offered to rent him a firearm for $250.

Burke described to defendant how the robbery was going to occur explaining, "We going to pick him up, zoe him and kick that n[*****] out of the car." Burke said the term "zoe" meant "rob." Defendant responded, "It don't matter which way it goes. [The victim] getting stuck up. If I can get this f[******] . . . [p]ole." Burke explained the term "pole" meant gun. The two continued exchanging text messages, expressing their frustration over not having access to a gun.

On June 29, 2019, Burke and defendant met at a Dunkin' Donuts in North Bergen and walked to a nearby gas station. Defendant contacted Rodriguez about using his gun and car for the robbery. Rodriguez later arrived at the gas station driving a "Lexus with a back bumper falling off." Although Rodriguez

8

told them he did not have a gun at that time, they all got into Rodriguez's car. Rodriguez moved his car into another spot and, after "[twenty] to [forty] minutes," codefendants Burgos and Torres arrived in an "old, beat-up Toyota Corolla" and parked nearby.

According to Burke, Rodriguez told him and defendant he did not want to use his car for the robbery. Burke testified defendant told him Burgos and Torres were "going to help [them] do the robbery" and they would use the Toyota. As a result, defendant and Burke got into the Toyota with Burgos and Torres. Surveillance footage from the gas station captured the parties meeting at the gas station, entering the Lexus, and a green Toyota arriving at the gas station while they were still there.

Burke testified Burgos drove them in the Toyota to "what we thought was the victim's house on 4th Street in Fairview." He believed the "plan" was for defendant and him to commit the robbery, while Burgos and Torres waited in the car. However, when they arrived, Duque-Soto came outside and Burke and Duque-Soto went into the apartment.

Burke did not have a gun in his possession at that time. He explained his plan "[a]t that point" was as follows:

> I was going to meet with the victim[, Duque-Soto],
> show him a sample size of weed. He was going to give

A-3313-22

> me the money for the rest of the weed. I was going to take the money, go into the car – well, tell him I'll be back with the rest of the weed, and get into the car, and we were going to drive off and just basically leave him hanging.

However, after Burke showed Duque-Soto a sample of the marijuana he was going to sell him, Duque-Soto rejected it claiming it was low quality. Burke agreed to return with better product and left. Burke testified Duque-Soto's apartment did not "look like a place . . . people lived in" but "a place someone was just selling drugs out of . . . temporarily."

Burke returned to the Toyota. To avoid looking "soft" to his cohorts, he lied and told them he was unable to "rob" Duque-Soto because Duque-Soto "ha[d] a gun" and seemed to be aware of what was going on. Burke testified defendant reacted by saying they should have gotten a gun from Rodriguez. Rodriguez had driven his own car to the area and had parked "halfway down the block." Defendant exited the Toyota, saying he was going to get a gun from Rodriguez's house.

Defendant walked down to Rodriguez's car and got in. They drove to another gas station with the others following in the Toyota. At the gas station, Burke told Rodriguez his made-up story about the failed robbery. Defendant stressed to Rodriguez they needed his gun because Duque-Soto had a gun.

Burgos remarked he wanted to steal Duque-Soto's gun. Ultimately, Rodriguez agreed to get his gun. Surveillance footage played for the jury depicted both vehicles arriving at the gas station and defendant, Burke, Burgos, Torres, and Rodriguez conferring together before leaving.

Thereafter, both cars drove to Rodriguez's house where Burke observed Rodriguez enter and then exit the house with the butt of a handgun "poking out of his waistband." Rodriguez got into the Lexus with defendant. After sitting in the car for a little while, defendant exited the car, at which time Burke saw the butt of the same handgun poking out of defendant's waistband. Defendant told Burke, Burgos, and Torres, who were in the Toyota, that he should drive because he was the only one of them with a valid driver's license. Defendant then got into the driver's seat of the Toyota.

Defendant drove to his house and went inside briefly. Defendant then drove to Kamena Street, near Duque-Soto's apartment. According to Burke, defendant wanted Torres to accompany Burke into Duque-Soto's apartment. Defendant gave the gun to Torres and said, "I can't go in there, but make sure my man's good in there," referring to Burke. Burgos volunteered to accompany Burke and Torres and "pulled out a second gun and put it in his waistband."

11

Burke described Torres's gun as "big and boxy almost like . . . a Glock," while Burgos's gun was "significantly smaller."

Burke said he had been in continuous contact with Duque-Soto via Snapchat, but was "vague about what time" he was going to arrive. Burke, Torres, and Burgos walked to Duque-Soto's apartment while defendant stayed in the car to serve as the getaway driver. Surveillance footage played for the jury showed the three codefendants walking towards Duque-Soto's apartment.

When they got to Duque-Soto's apartment, the door was open. Burke entered with Burgos and Torres trailing behind. In addition to Duque-Soto, Burke saw another person inside the apartment. Burke told Duque-Soto he "ha[d] the stuff" and asked for the money. Duque-Soto seemed upset that Burke brought two other men and complained that Burke was supposed to be alone. At that point, Burgos and Torres drew their guns. Burke "panicked" and punched Duque-Soto in the face. Then, Burgos and Torres "started shooting." Burke said the other person in the apartment ran into the bathroom when the shooting started.

According to Burke, it sounded like "two or three" shots were fired. Burke never expected any shots would be fired and thought "the worst" that would happen was that someone would flash a gun or show Duque-Soto the "butt of

12

the gun" to scare him.  Because Burke had told Burgos Duque-Soto had a gun, Burgos kept looking for Duque-Soto's gun.  Burgos patted Duque-Soto down and flipped over the couch, saying, "I thought he had a gun."  Burgos also picked up baggies full of drugs from the floor and put them in his pocket.

The three codefendants then left the apartment without taking the purchase money and ran to the car where defendant was waiting.  Once they entered the car, defendant drove away.  Surveillance footage played for the jury showed Burke, Torres, and Burgos running south away from the apartment shortly after they had entered.  Audio footage from a nearby residence captured the sound of three gunshots at approximately 6:42 p.m.

According to Burke, while inside the car, Torres returned the gun to defendant, and Torres and Burgos told defendant and Burke not to "say anything."  Burke and defendant then exited the car and called Rodriguez for a ride.  When Rodriguez arrived, defendant gave Rodriguez the gun, after which they all went to a friend's house in New York City.  During the ride, Rodriguez commented that Duque-Soto was likely dead, "a goner," because the gun was loaded with "red[-]tipped bullets."

When Burke attempted to contact Duque-Soto that night via Snapchat, there was no response.  Fearing that Duque-Soto was dead, Burke testified that

13

just after 8 p.m. on June 29, he texted a friend and asked him to find out if there were security cameras near Duque-Soto's apartment. Burke also testified he conducted forty-two Google searches that night looking for any information regarding Duque-Soto.

Burke testified that at 12:40 a.m. the following day, he and defendant began exchanging text messages.[2] During the exchange, Burke texted defendant, "They got to relax out here," and advised defendant to either flee to North Carolina or not go outside of his neighborhood. Defendant responded that Burke was "scaring" him.

Dempsey testified law enforcement executed a search warrant at Rodriguez's residence on July 1, 2019. A loaded Glock 9 mm handgun was recovered from a hole in the attic floor, with three "red[-]tip[ped]" Hornady Luger cartridges in the magazine. Additionally, the search recovered drug packaging, jars of marijuana, a drug scale, and $3,704 in cash. In the driveway of the residence, police saw a brown Lexus with a missing bumper, which was the same Lexus seen on surveillance footage near the scene of Duque-Soto's homicide.

---

[2] Burke testified the last text message between himself and defendant prior to the shooting was at 3:55 p.m. on June 29, 2019.

FPD Captain Michael Martic testified a search of Burgos's mother's house in Jersey City on December 13, 2019, uncovered only a cell phone. However, Burgos's mother directed the police to "a storm drain" near her home, where she had discarded a firearm. Burgos had told his mother in a "jailhouse call" to retrieve the firearm from the roof of her home and "get rid of [it]." The police recovered a .32 caliber KelTec handgun buried in "a black plastic bag" in sludge and other filth inside the drain.

New Jersey State Police (NJSP) Detective Sergeant Joshua Smith, who was qualified as an expert in the field of forensic firearms examination, examined the three weapons recovered during the investigation—the Glock 9 mm, the KelTec .32 caliber, and the .22 caliber found in Duque-Soto's couch. According to Smith, both the Glock and .22 caliber were operable, but the KelTec was rusty and inoperable.

Smith opined the two bullets found in the victim's body by the medical examiner were .32 caliber. Although the bullets were fired from the same gun, Smith could not determine whether the bullets were fired from the .32 caliber KelTec handgun found in the storm drain due to the significant damage to the weapon. However, he opined the .32 caliber shell casings found in the victim's home were discharged from the .32 caliber KelTec. He explained how he was

15

able to reach that conclusion with regard to the shell casings, but not with regard to the bullets themselves. Smith also opined the spent 9 mm shell casing and bullet fragment found inside the victim's residence were discharged from the Glock found in Rodriguez's attic. NJSP Sergeant James Hearne testified a search of records did not reveal defendant possessed a gun permit.

BCPO Detective Kristen Paxos, a digital forensic analyst, testified GPS data from Burke's and Rodriguez's phones showed they were near locations that supported Burke's version of events on June 29, 2019.

Anand Patel of the BCPO Visual Forensics Lab was qualified as an expert in digital forensics. He testified about the extractions from the cell phones of Burke, Torres, Rodriguez, and Duque-Soto, and the multiple communications between Burke, Torres, Rodriguez, and a number that ended in 2944, which was labeled in Burke's and Rodriguez's phones as "David," and in Torres's phone as "Trendy." Patel admitted he did not know the identity of the owner of that phone.[3]

Patel testified there were: 479 text messages between "David" and Burke between May 28 and June 30, 2019; seventy-nine text messages between Rodriguez and "David" between June 27 and 30, 2019, all of which were deleted

---

[3] Burke testified his contact number for defendant ended in 2944.

by Rodriguez; and a group chat involving Rodriguez, in which "David" sent a "a few second[]" long video of defendant to the group. There were also twenty-six calls between Torres and "Trendy" between June 18 and July 1, 2019, all of which Torres deleted. Twenty of the deleted calls were made on the night of June 29, 2019.

Patel also testified Burke texted "David" at 6:30 p.m. on June 28, 2019, saying, "We robbing his stupid ass," to which "David" replied, "WHERE HE AT." Burke responded, "we got to set it up." According to Patel, on June 30, 2019, Rodriguez texted Burke that "David not sayin . . . shit." Patel further testified that Torres's phone searched "news" for the first and only time on the night of June 29, 2019, after the shooting.

On cross-examination, Patel admitted he did not know how the Cellebrite system he used extracted data from a phone. Further, he did not know whether law enforcement had ever tried to find out the subscriber information for the 2944 phone number, identified as belonging to "David" or "Trendy." Additionally, Patel acknowledged although there were texts between Burke and Duque-Soto on June 29, 2019, there were no texts between Duque-Soto and the 2944 number.

17

On March 13, 2023, the jury returned a verdict of guilty on all charges. After defendant was sentenced, the judge entered a conforming JOC on May 4, 2023. This appeal followed.

## II.

In Point I, defendant argues he had requested a lesser-included-offense instruction on conspiracy to commit theft. He asserts his request should have been granted because there was a rational basis in the record for the jury to acquit him of conspiracy to commit armed robbery and convict him of the lesser conspiracy to commit theft, specifically, a "snatch and grab" theft. He contends the error requires reversal of his convictions on all counts. We disagree.[4]

---

[4] We reject the State's contention that defendant did not preserve the issue for appellate review. At the March 2, 2023 charge conference, defense counsel stated, "[W]e might want a lesser[-]included – instead of conspiracy to [commit] armed robbery, conspiracy to commit theft, which would then necessitate the lesser[-]included language in that charge." Counsel continued, "[W]e would suggest a lesser[-]included of conspiracy to commit theft." The prosecutor strenuously objected, arguing conspiracy is a stand-alone crime and "does[ not] have a lesser[-]included," an argument with which the judge agreed. A lengthy discussion ensued, after which the judge rejected defense counsel's request but invited him "to file a letter with the [c]ourt" with supporting caselaw. Although counsel later filed a letter setting forth several arguments and objections to the proposed charge, he did not renew his request for a lesser-included conspiracy to commit theft charge. Likewise, at another charge conference conducted on March 7, 2023, counsel did not renew his request. Despite counsel's equivocation, we are satisfied counsel met his obligation to preserve the issue for appeal. See R. 1:7-2 (providing a party "shall make known to the court" the

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions."  State v. Afanador, 151 N.J. 41, 54 (1997).  "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'"  State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

"No party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate."  State v. Jordan, 147 N.J. 409, 422 (1997).  Every "request must concern legal and factual issues that have been properly raised in the proceedings," and "[e]very request must state the correct principles of applicable law in a manner that is tailored to the facts of the case and is not misleading."  Green, 86 N.J. at 290.

The legal principles governing a trial court's consideration of a defendant's request to charge a lesser included offense are well settled.  N.J.S.A. 2C:1-8(e) provides that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."  Therefore, "whether an included offense charge is

---

action "the party desires the court to take or the party's objection to the action taken" to preserve questions for appeal "relating to . . . instructions to the jury").

appropriate requires (1) that the requested charge satisfy the definition of an included offense set forth in N.J.S.A. 2C:1-8[(d)], and (2) that there be a rational basis in the evidence to support a charge on that included offense." State v. Thomas, 187 N.J. 119, 131 (2006). "In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." State v. Carrero, 229 N.J. 118, 128 (2017).

N.J.S.A. 2C:1-8(d) provides that an offense is an included offense when:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or
>
> (3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property[,] or public interest[,] or a lesser kind of culpability[,] suffices to establish its commission.

"Whether an offense is an included offense of another charge requires a comparison of the statutory elements of each charge." Thomas, 187 N.J. at 129. An offense is included "where the proof required to establish a greater offense is also sufficient to establish every element of a lesser offense," or "where two offenses are the same but a lesser degree of culpability is required to establish

20

the lesser offense." Id. at 129-30 (quoting State v. Muniz, 228 N.J. Super. 492, 496 (App. Div. 1988), rev'd on other grounds, 118 N.J. 319 (1990)). The purpose of instructing on lesser-included offenses is "to give juries a range of options so that they will not be forced to decide between a conviction for a crime more serious than the one committed or no conviction at all." State v. Short, 131 N.J. 47, 58 (1993).

"The determination of whether an offense is included within an offense charged is not open-ended." Thomas, 187 N.J. at 131. As such,

> when a defendant requests a charge to the jury on a lesser offense, our case law has held that whether the lesser offense is strictly "included" in the greater offense, as defined by N.J.S.A. 2C:1-8(d), is less important to a trial court's determination to charge the offense than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser.
>
> [Thomas, 187 N.J. at 131-32 (citation reformatted) (quoting State v. Brent, 137 N.J. 107, 117 (1994)).]

However, our courts have cautioned that "sheer speculation does not constitute a rational basis." Id. at 132 (quoting Brent, 137 N.J. at 118). Indeed, "[t]he submission of an included crime is justified only where there is some basis in the evidence for finding the defendant innocent of the crime charged and yet guilty of the included crime." Brent, 137 N.J. at 115 (quoting Model Penal Code

§ 1.08 cmt. at 42-43 (Unif. L. Comm'n 1956) (Tentative Draft No. 5, 1956)); <u>see also</u> <u>State v. Cassady</u>, 198 N.J. 165, 179 (2009) (holding trial court was not required to instruct jury on lesser-included offense of theft where facts clearly established robbery).

> Accordingly, when a defendant requests a jury instruction on a lesser-included offense and is denied the requested instruction, an appellate court reviews the denial of that request, determining whether "the evidence presents a rational basis on which the jury could [1] acquit the defendant of the greater charge and [2] convict the defendant of the lesser." <u>Brent</u>, 137 N.J. at 117. If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error. <u>Id.</u> at 118.
>
> [<u>Carrero</u>, 229 N.J. at 128 (citations reformatted).]

Here, the judge had no obligation to charge conspiracy to commit theft because it is not a lesser-included offense of conspiracy to commit robbery. Pursuant to N.J.S.A. 2C:5-2(a), a person is guilty of a conspiracy with another if, with the purpose of promoting or facilitating a crime, he or she

> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

A person is guilty of first-degree robbery if, in the course of committing a theft, he or she "attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon." N.J.S.A. 2C:15-1(b). A person is guilty of second-degree robbery if he or she, among other circumstances, "[i]nflicts bodily injury or uses force upon another," or "[t]hreatens another with or purposely puts him [or her] in fear of immediate bodily injury." N.J.S.A. 2C:15-1(a)(1) to (2). On the other hand, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." N.J.S.A. 2C:20-3(a).

In addition, defendant was not entitled to a charge of conspiracy to commit theft as a lesser included offense because there was no rational basis in the evidence to support such a charge. The only rational conclusion to be drawn from Burke's testimony and the corroborating text messages in the period leading up to the homicide was that Burke and defendant were planning a robbery, not a theft. In discussing the agreement, Burke told defendant outright, "We robbing [the victim's] stupid ass," and defendant responded, "WHERE HE AT." In summarizing the plan to defendant, Burke stated, "We going to pick him up, zoe him and kick that n[*****] out of the car." The term "zoe" meant

23

"rob." Defendant responded, "It don't matter which way it goes. [The victim] getting stuck up. If I can get this f[******] . . . [p]ole." The term "pole" referred to a gun. Defendant and Burke followed up their text exchanges with their focused efforts to obtain a firearm and a car to accomplish their plan.

Defendant argues a lesser-included charge of conspiracy to commit theft was supported by Burke's testimony that when he first arrived at the victim's apartment, he was going to entice and deceive the victim with a sample and not return with the rest of the "weed" after receiving full payment. However, at that juncture, the original agreement to rob the victim had already been made as evidenced by the text messages. See N.J.S.A. 2C:5-2(e) (describing the requirements necessary to renounce a conspiracy, including the need to report the plan to the authorities). Defendant and his codefendants were charged with conspiracy to commit armed robbery based on the original agreement. Even if there was a secondary plan to commit theft, the State was not required to charge defendant and his codefendants with that separate crime.

Simply put, the evidence supported the conclusion that defendant and his codefendants conspired to rob Duque-Soto. There was no rational basis in the evidence to support an instruction for conspiracy to commit theft as a lesser

24 <span>A-3313-22</span>

included offense as claimed by defendant. Accordingly, there was no error in the jury instruction.

## III.

In Point II, defendant argues the State "improperly introduced lay-opinion testimony" from Lieutenant Dempsey "that vouched for the truth" of Burke's testimony. According to defendant, Burke was "the single most important State witness, because he was the only eyewitness" and "the State wanted the jury to believe" Burke's testimony that "Torres gave his gun to defendant" to implicate defendant in the "handling of the gun." Defendant asserts offering Dempsey's testimony, which "functionally vouched for Burke's credibility," was "grossly improper," violates his right to a fair trial, and mandates the reversal of his convictions.

"The trial court's evidentiary rulings 'are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).

> Under that deferential standard, we review a trial court's evidentiary ruling only for a "clear error in judgment." State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). We

25

do not substitute our own judgment for the trial court's unless its "ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

[State v. Medina, 242 N.J. 397, 412 (2020).]

During his direct examination, Dempsey testified about the crime scene and his search of Rodriguez's home. Dempsey was not asked who shot Duque-Soto, who possessed the gun when it was fired, or who handled the firearms on the day of the shooting. However, during cross-examination, Dempsey was asked what he had said a year earlier at Burke's trial regarding how Rodriguez came into possession of the gun after the shooting. Dempsey responded he could not recall. Eventually, with the aid of a transcript from the earlier trial, Dempsey admitted on cross-examination he had testified at Burke's trial that Burgos gave the gun to Rodriguez. Dempsey also agreed the prior testimony was different from his testimony at defendant's trial moments earlier when he said he could not recall his prior testimony.

The questioning occurred as follows:

Q.    Okay. You don't have any idea who possessed that gun when it was fired, do you?

A.    I do not.

Q.    Sure?

26

A.    I do not.

Q.    Okay.  You testified in Lexie Burke's trial before, correct?

A.    Yes.

Q.    Okay.  Under oath?

A.    I don't recall who had the --

Q.    No, I just asked you twice and you said no.

A.    Yeah, because I don't recall.

Q.    You didn't say that.  You said no.  Did you say in a prior testimony under oath that you believe that you stated when asked who possessed that gun when it was fired you said Carlos Burgos?

A.    If that's what my previous testimony was, that was what I said.  That's what I believe -- that's what I knew at the time.

Q.    But you were under oath to tell the truth, correct?

A.    Yes.

Q.    Okay.  But you don't know how he got the gun, Dylan Rodriguez, correct?

A.    I don't.  I don't recall.  I don't recall.

Q.    Okay.  You testified only a year ago, yes or no?  Last February?

A.    Is -- that's when the trial was, yes.

27

. . . .

Q.     All right.  And you said you don't recall?  Well,
you said no and then you said you don't recall.

A.     I don't recall.

Q.     All right.  You said you believe he got it from
Carlos Burgos?

A.     If that's what I said then, that's what I believe.

Q.     Okay.  But I'm saying the truth, that's what you
said?

A.     Yes.

Q.     I'm not saying what you believe.  I'm saying you
were under oath --

A.     Yes.

Q.     -- and you said that, yes or no.

A.     I knew it then, yes.  I -- slipped my mind today.

. . . .

A.     I don't recall today.

After reviewing the transcript of his testimony in Burke's trial and refreshing his recollection, Dempsey admitted he was asked, "Do you have any knowledge as to who possessed that gun when the shooting occurred," and he had answered, "I do."  When asked, "And who was that," Dempsey had

28

answered, "Carlos Burgos." Dempsey had further testified he believed Rodriguez had gotten the gun from Burgos. Dempsey acknowledged his prior testimony in Burke's trial a year earlier was different from what he had testified to in defendant's trial just minutes earlier.

Prior to commencing redirect examination, the prosecutor requested permission to lead the witness to avoid potential <u>Bruton</u>[5] issues in connection with "the Carlos Burgos gun issue." Over defense counsel's objection, the judge granted the prosecutor's request. During redirect examination, the prosecutor allowed Dempsey to explain why his testimony had changed and was different from what he had said at Burke's prior trial. In that regard, the following colloquy occurred:

> Q. Now there came a point in time in this investigation after the Lexie Burke trial that the evidence changed, didn't it?
>
> A. Correct.
>
> . . . .
>
> Q. And you learned that Dylan Rodriguez did not provide Carlos Burgos that gun or Carlos Burgos, rather, did not provide Dylan Rodriguez that gun, correct?

---

[5] <u>Bruton v. United States</u>, 391 U.S. 123, 126 (1968) (holding a codefendant's incriminating confession may not be admitted against the defendant because to do so would violate the defendant's right of confrontation).

A-3313-22

A.    Correct, through, you know, other law enforcement officers.

Q.    And so at the time you testified on February 23rd, 2022, the evidence that we had in the case at that point showed that Dylan Rodriguez stated he gave the gun to Carlos Burgos?

A.    Correct.

Q.    Correct?

A.    Yeah.

Q.    I mean that Carlos Burgos --

A.    Vice versa.

Q.    -- gave the gun to Dylan Rodriguez, correct?

A.    Yes.

Defense counsel objected to the prosecutor asking Dempsey whether the evidence in the case had changed. During an ensuing sidebar, defense counsel argued Dempsey had "[no] direct knowledge" about who handled the gun. However, counsel acknowledged he had opened the door during his questioning on the subject. The judge directed the prosecutor to rephrase the question. The prosecutor then asked Dempsey: "So, if you were asked the question today[, 'D]id Carlos Burgos give Dylan Rodriguez the gun,['] would your answer be the same as it was [at Burke's trial] on February 23rd, 2022?" Dempsey responded, "No."

30

We discern no impropriety in the prosecutor's redirect examination of Dempsey as defense counsel "opened the door" to that line of questioning. "[T]he '"opening the door doctrine" is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.'" State v. Vandeweaghe, 177 N.J. 229, 237 (2003) (quoting State v. James, 144 N.J. 538, 554 (1996)). "The doctrine 'allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.'" Id. at 237-38 (quoting James, 144 N.J. at 554).

Our Supreme Court has explained: "Th[e] doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of the evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." James, 144 N.J. at 554. "Similar to the 'completeness' doctrine,[6] the 'open door' doctrine provides an adverse party the

---

6   "[T]he completeness doctrine allows the reading of a second writing or statement where 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" Alves v. Rosenberg, 400 N.J. Super. 553,

opportunity to place evidence into its proper context." Alves v. Rosenberg, 400 N.J. Super. 553, 564 (App. Div. 2008) (citing James, 144 N.J. at 554). Such "evidence is still subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence 'is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury.'" James, 144 N.J. at 554 (quoting N.J.R.E. 403).

Here, defense counsel's questions on cross-examination clearly opened the door to the prosecution's questions on redirect examination. Indeed, defense counsel acknowledged he had opened the door to that line of questioning. Notwithstanding defendant's implication to the contrary, defense counsel specifically asked Dempsey if he knew who possessed the gun when Duque-Soto was shot. When Dempsey replied he did not know or did not recall, defense counsel referred to Dempsey's testimony from Burke's prior trial wherein Dempsey had testified he believed Rodriguez had gotten the gun from Burgos. Defense counsel then had Dempsey admit his testimony in Burke's trial was different from his testimony in defendant's trial without inquiring about the

562 (App. Div. 2008) (quoting State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992)).

reason for the change. Defense counsel sought to discredit Dempsey's testimony, suggesting his lack of recollection was untruthful.

Under the "opening the door doctrine," the prosecution was permitted to inquire about the possible reasons for Dempsey's changed testimony. See James, 144 N.J. at 554. Indeed, the prosecution was permitted to put Dempsey's changed testimony into proper context to explain the reason his testimony changed was because the evidence had changed, not because Dempsey was untruthful. Moreover, contrary to defendant's contention, Dempsey did not bolster or "vouch for" Burke's credibility. Indeed, Dempsey never even referred to Burke's testimony or credibility, and never referenced Burke or Burke's plea bargain as the reason for his changed testimony.

Defendant's reliance on State v. McLean, 205 N.J. 438 (2011); State v. Reeds, 197 N.J. 280 (2009); State v. Frisby, 174 N.J. 583 (2002); State v. C.W.H., 465 N.J. Super. 574 (App. Div. 2021); and State v. Tung, 460 N.J. Super. 75 (App. Div. 2019), is misplaced as all five cases are clearly distinguishable. Dempsey's testimony did not involve an officer expressing "a belief in defendant's guilt" or "an opinion on matters that were not beyond the understanding of the jury," as in McLean, 205 N.J. at 463. In fact, Dempsey did not even reference defendant during the cross-examination or the redirect

examination. Similarly, Dempsey was not offered as an expert and did not give an opinion that "usurp[ed] the province of the jury to decide the ultimate issue of defendant's guilt," as in Reeds, 197 N.J. at 284-85.

Further, Dempsey did not opine on defendant's lack of credibility or guilt, as in C.W.H., 465 N.J. Super. at 593-96, or Tung, 460 N.J. Super. at 100-01. Nor did Dempsey recount the out-of-court testimony of non-testifying witnesses, "substantiate" Burke's testimony, or comment on defendant's credibility as in Frisby, 174 N.J. at 591-92, where officers testified that the alibi of the only other suspect in the case was "more credible" than the defendant's and was also "substantiate[d]" by non-testifying witnesses.

We are satisfied defense counsel's cross-examination opened the door to the prosecutor's questions on redirect examination and the prosecutor did not elicit lay testimony that bolstered or "vouched for" Burke's credibility. Accordingly, we reject defendant's arguments and discern no error in the judge permitting the State's redirect examination of Dempsey.

IV.

In Point III, defendant challenges the felony murder jury instruction, arguing it was incorrect. Despite acknowledging that "felony murder under Title 2C is a strict-liability offense with no mens rea requirement toward the causing

of death," defendant asserts under "the applicable statutes," felony murder requires "a minimum mens rea of 'reckless' toward the causing of death." Consequently, according to defendant, because the jury was instructed that "there is no mental-state element for felony murder and that even an accidental killing qualifies as a felony murder if it occurs in the course of a robbery," the instruction "was a gross misstatement of the relevant statutes," and a violation of his constitutional rights to due process and a fair trial.

Because defendant did not object to the felony murder jury instruction during trial and raises the issue for the first time on appeal, we review for plain error.  See R. 2:10-2; State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2.").  Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."  State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting Adams, 194 N.J. at 207).

"Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for

rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting

Jordan, 147 N.J. at 422). Still, if a defendant does not object when a charge is

given, as here, "there is a presumption that the charge was not error and was

unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300,

320 (2017) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

Contrary to defendant's contention, the clear language of N.J.S.A. 2C:11-

3(a)(3), the case law, and the legislative history establish felony murder as a

strict liability offense. N.J.S.A. 2C:11-3 provides in pertinent part:

> a. Except as provided in N.J.S.A. 2C:11-4, criminal homicide constitutes murder when:
>
> (1) The actor purposely causes death or serious bodily injury resulting in death; or
>
> (2) The actor knowingly causes death or serious bodily injury resulting in death; or
>
> (3) It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism pursuant to section 2 of L. 2002, c. 26 (C.2C:38-2), and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants; except that in any prosecution under this subsection, in which the defendant was not the only participant in the

36

underlying crime, it is an affirmative defense that the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
>
> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
>
> [(Emphasis added) (citations reformatted).]

"Felony murder occurs when a death is caused in the course of committing one of the crimes listed in 2C:11-3(a)(3). Only those crimes will suffice." Cannel, New Jersey Criminal Code Annotated, cmt. 3 on N.J.S.A. 2C:11-3 (2025). Robbery is one of the enumerated felonies in N.J.S.A. 2C:11-3(a)(3).

"Unlike purposeful-or-knowing murder, felony murder is an absolute liability crime because a defendant need not have contemplated or intended the victim's death." State v. Cooper, 151 N.J. 326, 360 (1997) (emphasis in original); see State v. Walker, 203 N.J. 73, 83 (2010) (acknowledging felony

A-3313-22

murder is a strict liability crime); State v. Martin, 119 N.J. 2, 28 (1990) (concluding "felony murder is an absolute-liability offense")[7]; State v. McClain, 263 N.J. Super. 488, 491 (App. Div. 1993) ("Felony murder is an absolute-liability crime because the actor need not have contemplated or consciously risked the victim's death."); see also Cannel, cmt. 2 on N.J.S.A. 2C:11-3 ("Under 2C:11-3[(a)](1) and (2) only injury need be intended. Under 2C:11-3[(a)](3) only the other felony need be intended.").

In Cooper, the New Jersey Supreme Court explained:

> The only mental state required for felony murder is the specific mental culpability required to commit one of the particular underlying felonies specified in N.J.S.A. 2C:11-3(a)(3). Because the mens rea for purposeful-or-knowing murder is different from that required for felony murder, we do not believe that the Legislature intended to create a unified crime of murder. This Court has acknowledged in a capital case that the "elements are different" in felony murder than they are

---

[7] In Martin, 119 N.J. at 21, "[t]o comprehend the New Jersey Code's approach to felony murder," the Court examined the legislative history and considered "the pre-existing law, the Model Penal Code, and the New Jersey Commission's modifications of th[e] Code." In doing so, the Court noted "the [New Jersey] Commission decided that felony murder should be treated as an absolute-liability offense," and the "[a]mendments to the felony murder statute, N.J.S.A. 2C:11-3[(a)](3), likewise leave unaffected the nature of felony murder as a crime of absolute liability." Id. at 22, 23. The Martin Court equated the terms strict liability and absolute liability by referring to felony murder as "a crime of strict or absolute liability," and relying on N.J.S.A. 2C:2-3(e), which only uses the term "absolute." Martin, 119 N.J. at 11; N.J.S.A. 2C:2-3(e).

in purposeful-or-knowing murder. State v. Purnell, 126 N.J. 518, 531 (1992).

[Cooper, 151 N.J. at 360.]

The Cooper Court further explained "[t]he mental states required to convict for purposeful murder and knowing murder are 'equivalent expressions of moral culpability,'" and concluded "felony murder is not the moral equivalent of purposeful-or-knowing murder." Id. at 360-61. (quoting State v. Bey, 129 N.J. 557, 582 (1992)).

The Legislature's acquiescence in our courts' interpretation of N.J.S.A. 2C:11-3(a)(3) further supports the conclusion that felony murder constitutes a strict liability offense. "It is a 'well established canon of statutory interpretation' that the Legislature is presumed to know the judicial construction of its enactments." State v. Scott, 429 N.J. Super. 1, 9 n.6 (App. Div. 2012) (quoting Johnson v. Scaccetti, 192 N.J. 256, 276 (2007)). Thus, "a long period of legislative acquiescence or failure to amend [a] statute indicat[es] agreement with the Court's holdings." State v. Chapland, 187 N.J. 275, 291 (2006); see Macedo v. Dello Russo, 178 N.J. 340, 346 (2004) (explaining the Court "must assume that the Legislature approves of the consistent judicial interpretation of the [Consumer Fraud Act] that has been extant for four decades"). The New Jersey Legislature has acquiesced to the courts' interpretation of felony murder

as a strict liability offense for decades. "We consider ourselves bound by that Legislative acquiescence." Ibid.

Accordingly, we decline defendant's invitation to reexamine the felony murder statute and ignore decades of jurisprudence to adopt his self-serving reading of the statute. Because the judge gave a felony murder jury charge that substantially tracked the model jury charge, we discern no error, much less plain error. See Model Jury Charges (Criminal), "Felony Murder – Non-Slayer Participant (N.J.S.A. 2C:11-3a(3))" (rev. Mar. 22, 2004); see also State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) ("[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" (quoting State v. R.B., 183 N.J. 308, 325 (2005))).

## V.

In Point IV, defendant asserts "the [JOC] does not reflect the sentence that was imposed in court and should be amended." The State concedes the JOC is incorrect and "must be remanded to reflect the oral sentence."

The judge sentenced defendant to thirty years in prison, with a thirty-year period of parole ineligibility, for felony murder, and a concurrent five-year term of imprisonment, with a forty-two-month period of parole ineligibility, for

unlawful possession of a firearm. All other convictions were merged into the felony murder conviction.

We agree the JOC does not accurately reflect the oral sentence imposed by the judge. Although defendant's aggregate sentence is correct, the JOC: (1) mistakenly states defendant was convicted of murder; (2) omits defendant's conviction and sentence for unlawful possession of a firearm; (3) erroneously states defendant was sentenced to thirty years in prison, with a thirty-year parole disqualifier, for robbery, instead of felony murder; and (4) incorrectly lists which counts merged into the felony murder conviction.

"[W]here there is a conflict between the oral sentence and the written commitment, the former will control if clearly stated and adequately shown, since it is the true source of the sentence, instead of the latter which is merely the work of a clerk." State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956); see also State v. Walker, 322 N.J. Super. 535, 556 (App. Div. 1999) ("It is firmly established that the sentencing transcript is 'the true source of the sentence.'" (quoting Pohlabel, 40 N.J. Super. at 423)). Accordingly, we affirm the convictions and sentence, but remand for the limited purpose of correcting the JOC to reflect the oral sentence.

Affirmed and remanded for the limited purpose of correcting the JOC consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division